MUDGE v MACOMB COUNTY

Docket No. 103985. Argued November 5, 1997 (Calendar No. 6). Decided
July 1, 1998.

Tanya J. Mudge and Jonathon Brown brought an action in the
Macomb Circuit Court against Macomb County, the Macomb
County Sheriff, and the sheriff's department, alleging that the sher-
iff's department had obtained ex parte orders from the judge
assigned to their respective criminal cases, seizing their bond mon-
ies for reimbursement of the expenses of their incarceration in the
Macomb County jail. An amended complaint further alleged that
the defendants had breached MCL 801.81 et seq.; MSA 28.1770(1) et
seq., the Prisoner Reimbursement to the County Act, in failing to
commence a civil action within the prescribed period, precluding
them from retaining a portion of their bond monies. They further
asserted that the acts and omissions of the defendants violated 42
USC 1983 because they amounted to an unconstitutional depriva-
tion of their property in violation of the Fifth and Fourteenth
Amendments of the United States Constitution. The court, Deborah
A. Servitto, J., denied the defendants' motion for summary disposi-
tion. Thereafter, the defendants filed a counterclaim under the pris-
oner reimbursement act and also moved for rehearing or reconsid-
eration. The court granted reconsideration and entered an order
summarily dismissing the plaintiffs' amended complaint. The Court
of Appeals, D. E. HOLBROOK, JR., P.J., and REILLY and G. W. HOOD, JJ.,
reversed and remanded the case in an opinion per curiam, holding
that the defendants had acted ultra vires of the act in obtaining the
ex parte orders and that a municipality could be sued under 42
USC 1983 for unconstitutional or illegal policies or customs. The
Court further held that liability could be imposed for deliberate
indifference to a person's constitutional or statutory rights, and
that the defendants could not plead a counterclaim under the pris-
oner reimbursement act because the six-month limitation period
had expired (Docket No. 140863). The defendants appeal.

In an opinion by Justice TAYLOR, joined by Chief Justice MALLETT,
and Justices BRICKLEY, CAVANAGH, and KELLY, the Supreme Court
held:

The existence of postdeprivation remedies does not necessarily
bar the plaintiffs' claim brought under 42 USC 1983; a predepriva-

tion hearing could have been provided. The expiration of a limitation period does not foreclose a recoupment defense as long as the plaintiff's action is timely.

1. Actions that violate a state statute, but do not also violate the federal constitution or a federal statute, are not actionable under 42 USC 1983. The plaintiffs' amended complaint alleged that defendants' conduct violated the prisoner reimbursement act. However, the plaintiffs also pleaded 42 USC 1983 as a separate count, alleging that the defendants' actions violated their rights under the Fifth and Fourteenth Amendments of the federal constitution. If the defendants' conduct violated the federal constitution, the fact that the conduct also violated the prisoner reimbursement act is of no moment and is not a ground allowing a court to find that plaintiffs have not alleged a cause of action under 42 USC 1983.

2. The federal remedy is supplementary to the state remedy; the state remedy need not first be sought and refused before the federal is invoked. Because the plaintiffs' § 1983 claim is not necessarily barred by the existence of postdeprivation remedies, the fact that the plaintiffs could have asked the trial court or the Court of Appeals to vacate or overturn the ex parte orders when they finally learned of them is no bar to the § 1983 claim.

3. The Court of Appeals erred in holding that the defendants could not plead a counterclaim under the prisoner reimbursement act simply because the then-existing six-month limitation period had expired. The expiration of a limitation period does not foreclose a recoupment defense as long as the plaintiff's action is timely. Because the plaintiffs' § 1983 complaint was timely filed, the expiration of the limitation period for a county to bring a PRCA action, in and of itself, was not a bar to defendants seeking recoupment under the PRCA. However, while the plaintiffs' allegations are sufficient to state a cause of action for a violation of their due process rights, further factual development is necessary to determine the nature and extent of the county policy. Until this further development occurs, an evaluation of plaintiffs' claim that defendants' have unclean hands is inappropriate.

Justice WEAVER concurred in parts I and II of the majority opinion.

Affirmed in part, reversed in part, and remanded.

Justice BOYLE, concurring in part and dissenting in part, stated that, to avoid confusion over assertion of recoupment in the contract setting as opposed to other contexts, a trial court ought to analyze the defendant's right to assert the defense in light of *Bull v United States*, 295 US 247 (1935). The rule is clear: If a counterclaim or defense arises out of the same transaction, occurrence, or

claim as the plaintiff's claim, it is in the nature of recoupment, and the statute of limitations is inapplicable as long as the plaintiff's claim is timely and the defendant's right to recoupment existed when the plaintiff's claim arose. Recoupment beyond the statute of limitations will serve only to diminish or negate the defendant's liability in damages to the plaintiff. Should the trial court resolve the issue with respect to the county's conduct in such a way as to conclude that the § 1983 claim exists wholly outside the *Zinermon* dispute because the county sanctioned the alleged due process rationale by official act or custom, the conclusion that the county's hands are unclean might be appropriate. *Zinermon v Burch*, 494 US 113 (1990). However, if the county merely hired someone to implement the PRCA and that person and the sheriff acted without the county's sanction, the county should not be found to have unclean hands where it attempted in good faith to comply with the PRCA. Resolution of the issue now would amount to the Supreme Court resolving that the county's official sanction was present, a conclusion not supported by the record. That the bond monies were retained in lieu of a statutory debt does not conclusively establish that the county intentionally sought to deny the prisoners their rights under the constitution or the PRCA, or otherwise committed inequitable conduct sufficient to invoke the doctrine of unclean hands. The record is wholly inadequate.

A plaintiff seeking to maintain a due process claim under § 1983 must allege a deprivation of a constitutionally protected interest in life, liberty, or property. In this case, the plaintiffs' allegations are sufficient to state a cause of action for violation of their due process rights because the defendants seized their bond monies without a hearing of any kind and treated the bond monies as if they had been forfeited to the county and as if the ex parte orders attaching the bond monies already had been reduced to judgment without notice and a hearing. The due process violation alleged arises not from the use of an ex parte procedure, but from its misuse in contravention of the statutory procedures to effectuate a property deprivation without a hearing. However, there is confusion in the federal circuit courts of appeal regarding the principal case on which the majority relies, *Zinermon v Burch*, and its relationship to *Parratt v Taylor*, 451 US 527 (1981), and *Hudson v Palmer*, 468 US 517 (1984).

The difficulty confronting the courts in cases involving these types of claims is determining whether a given claim should be evaluated under the *Parratt/Hudson* doctrine, which teaches that where a government official engages in random and unauthorized activity that results in a deprivation of life, liberty, or property, due

process is satisfied by adequate postdeprivation process. *Zinermon,* by contrast, appears to require predeprivation process in virtually all circumstances. The issue turns on *Zinermon*'s reference to the third prong of its apparent test that in order to trigger *Parratt/Hudson,* the defendant's conduct must be unauthorized in the sense the term is used in *Parratt* and *Hudson.* The courts' difficulty lies in determining when the conduct of the official actor is sufficiently authorized that the plaintiff may avoid the *Parratt/Hudson* doctrine. If *Parratt/Hudson* is interpreted narrowly, a plaintiff may successfully state a § 1983 cause of action where an official actor's allegedly unconstitutional conduct is wholly outside the discretion delegated to the actor in the context of applicable procedural safeguards, i.e., where the alleged deprivation was in direct procedural contravention of the state statute authorizing the very deprivation that occurred. Alternatively, if *Parratt/Hudson* is interpreted broadly, and postdeprivation process is available, the plaintiff may not maintain the § 1983 cause of action where the official actor's allegedly unconstitutional conduct was not authorized by the delegation of discretion.

Justice WEAVER concurred in part I of Justice BOYLE's opinion.

210 Mich App 436; 534 NW2d 539 (1995) affirmed in part and reversed in part.

*James M. Hacker* and *Lawrence A. Baumgartner* (*Jerald R. Lovell,* of counsel), for plaintiffs.

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C.* (by *John P. Jacobs* and *Kenneth L. Herrington*), for defendants.

Amici Curiae:

*Johnson, Rosati, Galica, Labarge, Aseltyne & Field, P.C.* (by *Marcia L. Howe*), for Michigan Defense Trial Association.

*Garan, Lucow, Miller, Seward & Becker, P.C.* (by *Rosalind Rochkind*), for Michigan Municipal League and Michigan Municipal Liability and Property Pool.

*Cohl, Stoker & Toskey, P.C.* (by *Peter A. Cohl* and *John R. McGlinchey*), for Michigan Association of Counties and Michigan Sheriffs Association.

TAYLOR, J. Tanya Mudge and Jonathon Brown filed a lawsuit in the Macomb Circuit Court against Macomb County, Macomb County Sheriff's Department, and William Hackel, Macomb County Sheriff. Plaintiffs alleged that the sheriff's department had obtained ex parte orders from the judge assigned to their respective criminal cases, seizing their bond monies for reimbursement of the expenses of their incarceration in the Macomb County jail. Plaintiffs' amended complaint alleged two causes of action: (1) breach of state law under the Prisoner Reimbursement to the County Act (PRCA), MCL 801.81 *et seq.*; MSA 28.1770(1) *et seq.*, and (2) a violation of 42 USC 1983.[1] The breach of state law count alleged that defendants had failed to commence a civil action within the prescribed period that would have potentially allowed defendants to obtain a portion of their bond monies under the PRCA. Plaintiffs thus sought return of their bond monies because their money had been converted without statutory authority. Plaintiffs also asserted that the acts and omissions of defendants had violated 42 USC 1983 because they amounted to an unconstitutional deprivation of their property in

---

[1] 42 USC 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

violation of the Fifth and Fourteenth Amendments of the United States Constitution.

Defendants filed a motion for summary disposition asserting several grounds. After the trial court denied the motion, defendants filed a counterclaim asserting, inter alia, a right to recoupment under the PRCA. Plaintiffs then filed a motion seeking summary disposition of defendants' counterclaim, arguing such a counterclaim was barred given that the limitation period under the PRCA had expired. Defendants also filed a motion for rehearing or reconsideration regarding the denial of their motion for summary disposition. The trial court subsequently granted reconsideration and entered an order summarily dismissing plaintiffs' amended complaint. The trial court never ruled on plaintiffs' motion to summarily dismiss the counterclaim because the counterclaim became moot upon dismissal of plaintiffs' complaint.

Plaintiffs appealed as of right, and the Court of Appeals reversed and remanded for further proceedings. 210 Mich App 436; 534 NW2d 539 (1995). Defendants filed an application for leave to appeal, which this Court initially denied, but ultimately granted in response to defendants' motion for reconsideration. Our order granting defendants' application for leave to appeal was limited to three questions: (1) whether a violation of the PRCA constituted a federal due process violation, (2) whether an action for damages was barred because the withholding of funds was pursuant to an order issued by the circuit court, and (3) whether defendants' claim for reimbursement under the PRCA could be raised by counterclaim after the time for bringing an action under the statute had expired. 454 Mich 890 (1997).

Plaintiffs were charged with unspecified criminal charges in the Macomb Circuit Court. Brown posted a $10,000 cash bond on May 17, 1988, to secure his release on bail. On October 5, 1988, while the charges were still pending against Brown, the sheriff's department requested, on an ex parte basis,[2] that the judge assigned to Brown's criminal case, enter an order.

The prefatory language in the order that the court signed stated that the Sixteenth Judicial Circuit was in possession of a sum of $10,000 and that it appeared that defendant "has/will" have incurred reimbursement charges as a consequence of the criminal case. The introductory language further indicated that the "Sheriff's Reimbursement Program for the County of Macomb" was requesting that the $10,000 be deposited with the department in lieu of payment toward reimbursement fees provided for under the PRCA. The order entered in Brown's case concluded as follows: "THEREFORE IT IS ORDERED, that the sum of $10,000 be released forthwith, and made payable to the County of Macomb for payment of reimbursement fee(s) upon conclusion of said matter(s), or until further order of the Court." Brown was eventually sentenced to six months in jail on June 22, 1989. Defendants' counterclaim indicates that Brown received a financial history form from the sheriff on or about June 27, 1989. Thus, the ex parte order seizing

---

[2] Section 8 of the PRCA authorizes a county to seek an ex parte order, pending a hearing on an order to show cause, restraining a defendant from disposing of known property if necessary to protect the county's right to obtain reimbursement under the act. MCL 801.88; MSA 28.1770(8). However, the ex parte orders issued against Mudge and Brown's bond monies were not issued pending a show cause hearing, and there was no attempt to demonstrate that ex parte orders were necessary to protect the county's right to reimbursement under the act.

Brown's money was apparently entered before he was convicted[3] and more than eight months before he was requested to provide financial information.[4] The sheriff's department apparently never served a copy of the ex parte order on Brown or the attorney representing him in his criminal case. It also appears that Brown first learned that his bond monies had been subject to the October 5, 1988, ex parte order after he was sentenced and he sought return of his bond money.[5]

---

[3] The PRCA only authorizes seeking reimbursement from inmates who have been convicted of a felony. MCL 801.83; MSA 28.1770(3). We disagree with the concurrence's statement, *post,* p 112, n 3, that the PRCA is not an exclusive remedy provision. The statutory language says the county *may* file an action if it wishes to obtain a judgment against an inmate that has been convicted of a felony. Use of the word "may" merely suggests that counties are not required to pursue costs of incarceration from inmates that are convicted of felonies. We further reject the concurrence's suggestion, *id.,* p 110, n 1, that a county need not postpone seeking an ex parte order until after conviction. MCL 801.88(2); MSA 28.1770(8)(2) does not allow a county to obtain an ex parte order in the hope that an incarcerated individual will eventually be convicted of a felony rather than, e.g., being acquitted or convicted of a misdemeanor or having the charges dismissed. There is no basis for concluding that the statute allows for the issuance of ex parte orders if necessary to protect the county's *potential* rather than actual right to reimbursement. The concurrence suggests that any "well-counseled potential obligor would dispose of any assets" that otherwise might be available to satisfy a judgment and suggests that any counsel that did not advise his client to dispose of assets would be incompetent. *Post,* p 111, n 1. This analysis overlooks several things. First, the concurrence's concerns could equally be stated with reference to any civil defendant. Second, the concurrence is overlooking the law regarding fraudulent conveyances.

[4] The Court of Appeals statement that Brown's bond monies were seized the day after he received the financial status form on June 27, 1989, is in error. 210 Mich App 441, n 2.

[5] Brown later signed an order on June 28, 1989, in which he approved and consented to the release of his bond. The order, as initially drafted, provided that $6,000 was to go to Brown and $4,000 was to go to the attorney who had represented him in the criminal case. However, the actual order entered had handwriting on it stating that the money was to be returned "after payment to Macomb County Sheriff of $3,765." Defendants argue that Brown's consent to the order returning his bond is a bar to his cause of action. The trial court rejected the argument that Brown's

A somewhat similar scenario occurred with reference to Mudge. A cash bond of $1,100 was posted by Mudge on December 20, 1988. Apparently soon after being sentenced to four months in jail, the sheriff's department requested the judge assigned to preside over Mudge's criminal charges to enter an order on an ex parte basis. The prefatory language and the actual language in the order that was entered was identical to the order entered with reference to Brown, except that the order recited that $1,000 was in the Court's possession and that it was to be released and "made

signing of the order barred his claim because Brown contested the voluntariness of his signature and the record showed different copies of the same order with significantly different information handwritten thereon. The Court of Appeals did not address this argument of the defendants. We decline to find that Brown's claim is barred by the order returning his bond money, given that the Court of Appeals did not address the issue and the fact that our order granting leave to appeal was limited to three issues and the significance of the order returning Brown's bond money was not one of them. Indeed, defendants' application for leave to appeal sought to raise four issues and the fourth issue was the significance of the order Brown signed. This Court, however, only granted leave to appeal regarding the first three issues defendants raised in their application. Because it is possible that the trial court may, after further development of the record, determine that the order returning bond monies is tantamount to a consent judgment, we find that the Court of Appeals erred in ordering defendants to return Mr. Brown's bond monies.

As for plaintiff Mudge, we find no error in the Court of Appeals ordering the return of her bond monies, given that her monies, were not taken in compliance with the PRCA. Contrary to the assertion of the concurrence, *post*, p 111, n 2, we have not determined that the validity of the "orders" was inadequately briefed. Rather, we have only declined to determine the significance of the order returning bond monies that Brown signed because the Court of Appeals did not reach the question and because we did not grant leave regarding the question. Further, Mudge, unlike Brown, did not sign any order returning her bond money. The concurrence also states that the ex parte order relating to Mudge was valid unless reversed on direct appeal, *id.*, but ignores the fact that the Court of Appeals did vacate the order. The concurrence is also in error when it states, *id.*, that Mudge never sought to have the ex parte order reversed. Count I of Mudge's complaint sought this exact relief. We find the Court of Appeals invocation of MCR 7.216(A)(7) to vacate the circuit court's ex parte order confiscating Mudge's bond monies was proper.

payable to the County of Macomb for payment of reimbursement fee(s) upon conclusion of said matter(s), or until further order of the Court."[6] Mudge's bond money appears to have been seized two months before she received defendants' financial status form. As with Brown, the ex parte order apparently was not served on Mudge or the attorney who was representing her in her criminal case. Mudge was released from jail on November 17, 1989. On March 21, 1990, Mudge was sent a form demand letter from the "County of Macomb Reimbursement Department." This letter indicated that Mudge had a current balance due of $1,140 and that payment of $125 was due. The letter further stated that the account would be turned over to a collection agency unless a payment was received within ten days.

The Court of Appeals held that defendants had acted ultra vires of the PRCA when they obtained ex parte orders from the circuit court. *Id.* at 440-441. It also vacated the ex parte orders, ordered that the bond monies be returned,[7] and found that defendants' recoupment counterclaim was barred. The Court of Appeals went on to hold that a municipality could be sued under 42 USC 1983 for unconstitutional or "illegal policies or customs" and that liability could be imposed for deliberate indifference to a person's constitutional or "statutory rights." *Id.* at 445.

---

[6] The lower court record contains two July 17, 1989, orders that referred to Mudge. The orders are identical, except that on one of them the $1,000 amount is crossed out and $100 is written in its place.

[7] In an unpublished order denying defendants' motion for rehearing, the Court of Appeals stayed that portion of its opinion requiring the return of the bond monies until defendants had exhausted their appellate remedies.

I

Defendants assert that the Court of Appeals erred in holding that a violation of the PRCA is actionable under § 1983, because violations of state statutes are not actionable under § 1983. Defendants are correct that actions violating a state statute, that do not also violate the federal constitution or a federal statute, are not actionable under 42 USC 1983. See, e. g., *Huron Valley Hosp v City of Pontiac*, 887 F2d 710, 714 (CA 6, 1989) (42 USC 1983 is limited to deprivations of federal statutory and constitutional rights; it does not cover official conduct that allegedly violates state law). Accord *Crawford-El v Britton*, 523 US 574; 118 S Ct 1584; 140 L Ed 2d 759 (1998) (the very purpose of § 1983 is to provide a remedy for the violation of federal rights).

Plaintiffs' amended complaint alleged that defendants' conduct violated the PRCA. However, plaintiffs also pleaded 42 USC 1983 as a separate count, alleging defendants' actions violated their rights under the Fifth and Fourteenth Amendments of the federal constitution. If defendants' conduct violated the federal constitution, the fact that the conduct also violated the PRCA is of no moment and is not a ground allowing a court to find that plaintiffs have not alleged a cause of action under 42 USC 1983.[8] *Zinermon v Burch*, 494 US 113, 124-125; 110 S Ct 975; 108 L Ed 2d 100 (1990) (a plaintiff may bring a § 1983 action for an unlawful search and seizure [in violation of the Fourth Amendment of the constitution] despite

---

[8] As amicus curiae Michigan Municipal League properly states in its brief: "no remedy is provided by § 1983 for the mere violation of state laws where the state conduct at issue is not violative of federal rights."

the fact that the search and seizure also violated the state's constitution or statutes).

Defendants argue that plaintiffs may not assert a § 1983 claim because of the existence of postdeprivation state remedies. To determine whether this argument is correct, we turn to *Zinermon*. In *Zinermon*, the Court explained that there are three kinds of claims that may be brought against a state under the Due Process Clause of the Fourteenth Amendment. *Id.* at 125. The Court said that the first is a claim against a state for a violation of many of the rights under the Bill of Rights. The Court said that the second § 1983 claim is a bar against certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. With regard to these two types of claims, the *Zinermon* Court stated: "the constitutional violation actionable under § 1983 is complete when the wrongful action is taken." *Id.*

The Court further explained that the Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure. *Id.* at 125. The Court said that the existence of state remedies is sometimes relevant to this third type of § 1983 claim. Unlike the first two types of claims, the constitutional violation under this third type is not complete when the deprivation occurs: it is not complete unless and until the state fails to provide due process. Under the third type, a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, may satisfy due process.

The *Zinermon* Court then clarified that the existence of a postdeprivation remedy is only relevant when the state is unable to provide predeprivation

process because of the random and unpredictable nature of the deprivation.[9] The Court concluded:

> In situations where the State feasiblely can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking. [*Id.* at 132.][10]

Plaintiffs' amended complaint specifically asserted that defendants' acts and omissions had deprived them of procedural due process. Thus, we analyze plaintiffs' claim under the third type of claim that may be asserted under 42 USC 1983.

Pursuant to *Zinermon*, plaintiffs have alleged a § 1983 claim that is not automatically barred because of the existence of postdeprivation remedies. This is because: (1) the seizing of plaintiffs' bond monies was not necessarily random or unpredictable (the fact that the ex parte orders were on preprinted forms and stated that "the Sheriff's Reimbursement Program to the County" was requesting the money contradicts any argument that defendants' actions were random

---

[9] The Court referenced *Parratt v Taylor*, 451 US 527; 101 S Ct 1908; 68 L Ed 2d 420 (1981) (postdeprivation remedy is all the process that was due where a guard negligently lost a prisoner's $23 hobby kit), and *Hudson v Palmer*, 468 US 517; 104 S Ct 3194; 82 L Ed 2d 393 (1984) (postdeprivation remedy is all the process that was due where a guard deliberately destroyed some of a prisoner's property), as examples of cases where the state was unable to provide predeprivation process because of the random and unpredictable nature of the deprivation.

[10] See also *Gilbert v Homar*, 520 US 924, 930; 117 S Ct 1807; 138 L Ed 2d 120 (1997):

> This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.

and unpredictable),[11] and (2) a predeprivation hearing could have been provided. Accord *Hudson v Palmer*, 468 US 517, 532-533; 104 S Ct 3194; 82 L Ed 2d 393 (1984) (postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state [here municipal] procedure, rather than random and unauthorized action), *Augustine v Doe*, 740 F2d 322, 329 (CA 5, 1984) (*Parratt v Taylor*, 451 US 527; 101 S Ct 1908; 68 L Ed 2d 420 [1981], applies only when the nature of the challenged conduct would render provision of predeprivation procedural safeguards impracticable or infeasible), and *Alexander v Ieyoub*, 62 F2d 709 (CA 5, 1995) (the *Parratt/Hudson* doctrine did not foreclose a § 1983 claim because the "random and unauthorized" element necessary for its application was absent where the challenged actions were in accordance with customary procedures).[12]

---

[11] The record also reflects that the county implemented its Prisoner Reimbursement program on May 27, 1985, that an employee was hired to implement the program after approval by the Board of Commissioners during an April 1985 meeting. In an April 1991 answer to an interrogatory, defendants stated that a "best estimate" was that only about fifty to sixty bonds per year were retained.

[12] We note that we only granted leave to determine whether plaintiffs, as a matter of law, could bring a § 1983 claim based on the PRCA. Thus, further factual development in the trial court may affect the applicability of liability under *Zinermon* with respect to this case. The record is not clear regarding the nature and extent of the authority given to the sheriff or other county employees to implement the county's reimbursement program. As the Court of Appeals explained:

> Although defendants acknowledge that the county's prisoner reimbursement program was the "dual creation" of the Macomb Circuit Court and the Macomb County Sheriff's Department, we are unable to determine from the limited record available whether the program, as implemented, was authorized by legislative act of the county's board of commissioners. [210 Mich App 447.]

Plaintiffs have properly alleged that they could have been provided, and therefore should have been provided, with notice and an opportunity to be heard before their bond monies were seized, or at least been provided with an opportunity to contest the matter at a show cause hearing. As the Sixth Circuit has explained:

> The touchstone of procedural due process is the fundamental requirement that an individual be given the opportunity to be heard "in a meaningful manner." [Citations omitted.] Many procedural due process claims are grounded on violations of state-created rights, as is the case here; rights that do not enjoy constitutional standing. However, the right to a hearing prior to the deprivation is of constitutional stature and does not depend upon the nature of the right violated. [*Howard v Grinage*, 82 F3d 1343, 1349 (CA 6, 1996).]

Similarly, the United States Supreme Court has stated:

> Although "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause," as Mr. Justice Jackson wrote for the Court in *Mullane v Central Hanover Tr Co*, 339 US 306 [70 S Ct 652; 94 L Ed 865] (1950), "there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 313. . . . In short, "within the limits of practicability," *id.* at 318, a State

---

Whether defendants ultimately will be held liable for the alleged due process violations in this case will only become apparent once the nature and extent of the county policy is more fully defined. Resolution of these issues is only appropriate after further factual development at the trial court level. We do not join the concurrence's assertion, *post*, p 139, n 30, that only nominal damages will be available in this case. Such a pronouncement is premature, given the fact that the kinds of damages that may be available have not been briefed and are not at issue.

must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause. [*Boddie v Connecticut*, 401 US 371, 377-379; 91 S Ct 780; 28 L Ed 2d 113 (1971).]

Plaintiffs' allegations are sufficient to state a cause of action for violation of their due process rights, under *Zinermon*, irrespective of the PRCA, because they have alleged that the county, or its agents, acting within the confines of the county's prisoner reimbursement policy, seized plaintiffs' bond monies without providing for a hearing of any kind. If plaintiffs' allegations are true, defendants treated the bond monies as if they had been forfeited to the county and as if already reduced to a judgment, without affording plaintiffs procedural due process through notice and a hearing and "took" any defenses[13] plaintiffs may have had to a claim for reimbursement without a hearing, show cause or otherwise.[14] Plaintiffs were entitled to a hearing where a court could consider their support obligations, if any. Thus, we reject defendants' claim that plaintiffs' § 1983 action is barred by plaintiffs' failure to exhaust postdeprivation state remedies.[15]

---

[13] MCL 801.87(3); MSA 28.1770(7)(3) provides: "Before entering any order on behalf of the county against the defendant, the court shall take into consideration any legal obligation of the defendant to support a spouse, minor children, or other dependents and any moral obligation to support dependents to whom the defendant is providing or has in fact provided support."

[14] See *Winters v Bd of Co Comm'rs*, 4 F3d 848 (CA 10, 1993) (a pawnshop was found to have a viable § 1983 claim under procedural due process where the sheriff seized a pawned ring and returned it to the victim of theft without providing notice or a hearing to the pawnshop as required by statute to determine the proper owner of the ring).

[15] Although not applicable to the case at bar, we note that the Prison Litigation Reform Act of 1995, 42 USC 1997e(a), forbids an incarcerated prisoner from filing an action under 42 USC 1983 with respect to prison

II

Having determined that the existence of post-deprivation remedies does not bar plaintiffs' § 1983 claim, we turn to the question whether the claim is barred because the withholding of funds occurred pursuant to orders issued by the circuit court. Defendants' argument regarding this issue is that plaintiffs' § 1983 claim should be barred because plaintiffs never asked the judge who entered the ex parte orders or the Court of Appeals to vacate or overturn the orders. Thus, defendants contend that plaintiffs were not free to file an independent § 1983 lawsuit in order to effectuate return of their bond monies, i.e., to collaterally attack the orders. Defendants assert that § 1983 should never be used as a state tort law, postjudgment, or appellate substitute. We reject defendants' argument.

*Zinermon, supra* at 124, quoted with approval the following language from *Monroe v Pape*, 365 US 167, 183; 81 S Ct 473; 5 L Ed 2d 492 (1961):[16]

> It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.

Given the fact that plaintiffs' § 1983 claim is not necessarily barred by the existence of postdeprivation remedies, the fact that plaintiffs could have asked the

---

conditions until available state administrative remedies have been exhausted. *Brown v Toombs*, 139 F3d 1102 (CA 6, 1998). Such exhaustion applies to cases filed on or after April 26, 1996, the effective date of the act. *Id.*

[16] Overruled in part on different grounds by *Monell v New York City Dep't of Social Services*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978).

circuit judge or the Court of Appeals to vacate or overturn the ex parte orders when they finally learned of them is no bar to plaintiffs' § 1983 action.

In granting leave to appeal regarding this particular issue, we anticipated that defendants might argue that they cannot be held responsible for any constitutional violation that may have occurred because the direct "cause" of any constitutional violation was the trial court's issuance of the ex parte orders and not the sheriff's department's request that the orders be entered. See, e.g., the discussion and cases cited in *Mayor of the City of Lansing v Ku Klux Klan (After Remand)*, 222 Mich App 637, 643 ff; 564 NW2d 177 (1997).[17] We deem the issue of causation inadequately briefed and do not reach it.[18] As we explained in

---

[17] In *City of Lansing*, the city filed an action in circuit court, seeking an injunction to have a rally planned to be held on the grounds of the Capitol moved to another site because of safety concerns. The defendant filed a counterclaim, asserting 42 USC 1983. The circuit court granted the requested injunction after hearing arguments from both sides. The Court of Appeals peremptorily reversed the injunction. On remand, the circuit court summarily dismissed the 42 USC 1983 action, concluding that the plaintiffs could not be held liable for seeking an overly broad injunction. The Court of Appeals affirmed, finding that the constitutional violation was caused by an act of the circuit court and not the act of the party who had requested the injunction. The Court of Appeals noted that a different holding could be expected if a party's misconduct taints the legal process so that the court's decision cannot be separated from the party's misconduct. The Court of Appeals stated that a merger of a party's actions with judicial action is sometimes implicated when judicial decisions are made on the basis of ex parte proceedings. The Court of Appeals also noted that *Malley v Briggs*, 475 US 335, 345-346; 106 S Ct 1092; 89 L Ed 2d 271 (1986), held that a magistrate's action in authorizing an arrest warrant did not insulate a police officer from personal liability under § 1983 for failure to exercise reasonable professional judgment in making the threshold determination whether the facts alleged could possibly justify an arrest.

[18] We agree with the Court of Appeals that, with regard to plaintiffs' § 1983 claim, the issue of causation is yet to be determined. 210 Mich App 448.

*Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959):

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.

III

Having determined that plaintiffs' § 1983 claim is not necessarily barred by the existence of post-deprivation remedies and that the causation issue is inadequately briefed, we turn to the question whether defendants' claim for the seldom invoked defense of recoupment under the PRCA may be raised by counterclaim after the time for bringing an action under the statute has expired.

Count VI of defendants' counterclaim alleged that Mudge and Brown had incurred debts of $1,100 and $3,765 respectively under the PRCA and that all or a portion of plaintiffs' damages, interest, attorney fees, and claims were negated, forfeited, reduced, diminished, mitigated, and legally voided on account of plaintiffs' liabilities under the PRCA.

Plaintiffs filed a motion for summary disposition, arguing that the counterclaim should be dismissed because defendants had not filed the counterclaim within the then-applicable six-month limitation period. As previously indicated, the trial court never ruled on plaintiffs' motion because the counterclaim became moot when the court granted reconsideration and granted defendants' motion for summary disposi-

tion of the plaintiffs' complaint. The Court of Appeals reversed the trial court's summary dismissal of the plaintiffs' complaint, holding that defendants' actions were in violation of the PRCA. The ex parte orders were vacated and the bond monies ordered returned. The Court of Appeals said that defendants' opportunity to seek reimbursement under the PRCA was lost because it had vacated the ex parte orders and because the limitation period of the PRCA had lapsed. *Id.* at 443.

Defendants assert that the Court of Appeals erred arguing: "[V]irtually any otherwise valid, but time-barred, action, can always be resurrected, defensively speaking, by a counterclaim, if the legal effect of that counterclaim is to negate or to reduce the principal claim, as long as the defensive countercomplaint does not seek any more than the damages which are claimed by the plaintiff." We agree that the Court of Appeals erred in simply stating that defendants could not seek recoupment by a counterclaim under the PRCA merely because the then-existing six-month limitation period had expired.

The defense of recoupment refers to a defendant's right, in the same action, "to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract." 20 Am Jur 2d, Counterclaim, Recoupment, etc., § 5, p 231. Recoupment is "a doctrine of an intrinsically defensive nature founded upon an equitable reason, inhering in the same transaction, why the plaintiff's claim in equity and good conscience should

be reduced." *Pennsylvania R Co v Miller*, 124 F2d 160, 162 (CA 5, 1941).

As explained in *Warner v Sullivan*, 249 Mich 469, 471; 229 NW 484 (1930):

> Recoupment is a creature of the common law. It presents to the court an equitable reason why the amount payable to the plaintiff should be reduced, and *the plaintiff will not be permitted to insist upon the statute of limitations as a bar to such a defense* when he is seeking to enforce payment of that which is due him under the contract out of which the defendant's claim for recoupment arises. [Emphasis added.]

Accord *Bull v United States*, 295 US 247, 261-262; 55 S Ct 695; 79 L Ed 1421 (1935) (the defense of recoupment is never barred by the statute of limitations as long as the main action itself is timely). See also anno: *Claim barred by limitation as subject of setoff, counterclaim, recoupment, cross bill, or cross actions*, 1 ALR2d 630, § 14, pp 666-667 ("Almost without exception the cases which deal with recoupments . . . run to the effect that if a defendant's claim is in fact a recoupment the general statutes of limitation do not defeat it; on the contrary it may be availed of defensively so long as plaintiff's cause of action exists"). Thus, the expiration of a limitation period does not foreclose a recoupment defense as long as the plaintiff's action is timely.[19] Given that

---

[19] See also MCL 600.5823; MSA 27A.5823, which provides:

> To the extent of the amount established as plaintiff's claim the periods of limitations prescribed in *this chapter* do not bar a claim made by way of counterclaim unless the counterclaim was barred at the time the plaintiff's claim accrued. [Emphasis added.]

The emphasized language in the statute refers to chapter 58 of the Revised Judicature Act. However, the time limitation within which a county has to file a claim under the PRCA, MCL 801.87(1); MSA

plaintiffs' § 1983 complaint was timely filed, the expiration of the limitation period for a county to bring a PRCA action, in and of itself, was not a bar to defendants seeking recoupment under the PRCA. However, as previously indicated, defendants still have to show that plaintiffs did not comply with some cross obligation or legal duty under the PRCA in order to seek recoupment.[20]

As an alternative basis for upholding the Court of Appeals, plaintiffs argue that defendants' recoupment counterclaim should be barred because defendants

---

28.1770(7)(1), is not found in chapter 58. Thus, defendants are not entitled to assert MCL 600.5823; MSA 27A.5823 as a basis for permitting them a counterclaim under the PRCA.

We also take note of MCL 600.5821(4); MSA 27A.5821(4) which provides:

Actions brought in the name of the state of Michigan, the people of the state of Michigan, or any political subdivision of the state . . . for the recovery of the cost of maintenance, care, and treatment of persons in hospitals, homes, schools, and other state institutions are not subject to the statute of limitations and may be brought at any time without limitation, the provisions of any statute notwithstanding.

If a county jail can be properly considered a "state institution," see, e.g., *Moreton v Secretary of State*, 240 Mich 584, 591-592; 216 NW 450 (1927), and if MCL 801.87(1); MSA 28.1770(7)(1) is not read as an exception to MCL 600.5821(4); MSA 27A.5821(4), see, e.g., *Detroit v Michigan Bell Telephone Co*, 374 Mich 543, 558; 132 NW2d 660 (1965); *Atlas v Wayne Co Bd of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937), two issues we do not reach because they have not been briefed, this statute might allow defendants' counterclaim notwithstanding the expiration of the PRCA limitation period.

[20] Thus, we apply the general recoupment rule from Am Jur 2d typically applied in contract cases to this case. The concurrence would apply the same transaction rule from *Bull, supra*, and would allow recoupment even if plaintiffs did not violate some cross obligation or legal duty under the PRCA. We find it appropriate to apply the Am Jur rule because the PRCA is akin to a contract in that it placed certain duties and obligations on the parties, not existing at common law and thus not reimbursable before enactment of the PRCA, relating to possible reimbursement for certain costs of incarceration.

have unclean hands.[21] We first note that this argument
was not made to the trial court. Because of this,
neither plaintiffs nor defendants submitted affidavits
or other documentary evidence bearing upon this
question. Further, this issue was not reached by the
Court of Appeals. Under such circumstances, it would
be unwise and premature for this Court to consider
this argument.[22] While we have found that plaintiffs'
allegations are sufficient to state a cause of action for
a violation of their due process rights, further factual
development is necessary to determine the nature and
extent of the county policy. Until this further factual
development occurs, an evaluation of plaintiffs' claim
that defendants have unclean hands is inappropriate.[23]

---

[21] *Stachnik v Winkel*, 394 Mich 375, 382, 386; 230 NW2d 529 (1975); *Falk v State Bar of Michigan*, 411 Mich 63, 113, n 27; 305 NW2d 201 (1981); *Seguin v Madison*, 328 Mich 600, 607; 44 NW2d 150 (1950); *Rust v Conrad*, 47 Mich 449, 454; 11 NW 265 (1882).

[22] Thus we do not join in the concurrence's claim, *post*, p 117, that the ex parte orders can be viewed as a misinterpretation of the requirements of the act or were inartfully drafted. All parties including these defendants are presumed to know the law. *Grand Rapids Independent Publishing Co v Grand Rapids*, 335 Mich 620, 630; 56 NW2d 403 (1953). Omitting the required hearing cannot fairly be characterized as inartful drafting. We also reject the concurrence's claim that the county's attempt to operate in good faith is demonstrated by the fact that the ex parte orders were obtained in the venue mandated by the statute, i.e., Macomb County. *Post*, p 117, n 6. The more likely explanation is traceable to the fact that, after all, the money was being held in the Macomb Circuit Court. This is something Willie Sutton (a notorious bank robber from an earlier era who when asked why he robbed banks explained "that is where the money is") understood about venue and probably defendants did also.

[23] We disagree with the concurrence's assertion that the trial court should consider the nature of the plaintiffs' conduct in evaluating the unclean hands issue.

> "[The clean hands maxim] is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant.*" [*Stachnik*, n 21 *supra*, p 382 (emphasis added).]

We affirm in part, reverse in part, and remand for further proceedings.

Mallett, C.J., and Brickley, Cavanagh, and Kelly, JJ., concurred with Taylor, J.

Weaver, J. I concur only in parts I and II.

Boyle, J. I concur in part and dissent in part with respect to the majority's treatment of the counterclaim issue.[1] I also concur with the majority's treat-

---

[1] The majority states that "[t]he PRCA only authorizes seeking reimbursement from inmates who have been convicted of a felony." *Ante* at 94, n 3, citing MCL 801.83; MSA 28.1770(3). However, MCL 801.87(1); MSA 28.1770(7)(1) is not an exclusive remedy provision. It stated at the relevant time that "[w]ithin 6 months . . . an attorney for that county *may* file a civil action . . . ." The act contemplates a collection process in which the prisoner is required to cooperate, and the civil action is only relevant if the county decides that it needs to obtain a judgment against the prisoner. Moreover, MCL 801.88(2); MSA 28.1770(8)(2) provides:

> If necessary to protect the county's right to obtain reimbursement under this act against the disposition of known property, the county, in accordance with rules of the supreme court of this state, may seek issuance of an ex parte restraining order to restrain *the defendant* from disposing of the property pending a hearing on an order to show cause why the particular property should not be applied to reimbursement of the county for the maintenance and support *of the defendant as a prisoner.* [Emphasis added.]

This provision does not require that the county postpone seeking the ex parte order only until after conviction, but plainly contemplates issuance of the order before conviction if necessary. To the extent the majority implies that the ex parte procedure must be postponed until after conviction, I disagree.

The majority states that "[t]he statutory language says the county *may* file an action if it wishes to obtain a judgment against an inmate that has been convicted of a felony." *Ante* at 94, n 3. This is exactly the point: Use of the word "may" does not suggest this is the exclusive remedy to recover costs, as opposed to obtaining a judgment. Likewise, use of the word "may" in the provision providing for ex parte action does not suggest that ex parte action otherwise authorized by MCR 3.310 is superseded and unavailable to the county as creditor and potential judgment obligee.

ment of the causation issue, to the extent it deems the issue inadequately briefed.[2] I concur with the

---

In addition to these basic considerations of grammatical and statutory construction, common sense suggests that the Legislature intended the phrase "ex parte" to mean what it means in any other context: maintenance of the status quo pending a determination of a substantive issue. It makes no sense to conclude that the Legislature intended to defray the burden on taxpayers for the care of convicted defendants by authorizing its recovery and simultaneously precluding the county from preventing the dissolution of assets that otherwise might be available to satisfy a judgment. Since any knowledgeable or well-counseled potential obligor would dispose of any assets under this scenario, the majority's interpretation amounts to a conclusion that the Legislature created a remedy that would only be efficacious in the case of a wholly uninformed defendant represented by incompetent counsel. For example, MCL 800.404a; MSA 28.1705, authorizing recovery of costs incident to custody of state prisoners provides in relevant part:

(1) Except as provided in subsection (3), in seeking to secure reimbursement under this act, the attorney general may use any remedy, interim order, or enforcement procedure allowed by law or court rule including an ex parte restraining order to restrain the prisoner or any other person or legal entity in possession or having custody of the estate of the prisoner from disposing of certain property pending a hearing on an order to show cause why the particular property should not be applied to reimburse the state as provided for under this act.

(2) To protect and maintain assets pending resolution of an action under this act, the court, upon request, may appoint a receiver.

[2] The majority states, *ante* at 94, n 5, with respect to the appropriateness of the Court of Appeals remedy of ordering the return of plaintiff Mudge's bond monies, that the Court of Appeals did not err in ordering such return absent the county's compliance with the PRCA. Thus, the majority, while determining in part II of its opinion, that the issue of the validity of the orders, i.e., whether the orders may be collaterally attacked, was inadequately briefed, inconsistently upholds return of the bond money to Mudge. The majority thus sustains a collateral attack by Mudge, asserted on the ground that the order violated the PRCA. Assuming, arguendo, that the sheriff acted ultra vires of the PRCA, the trial court's order was not void. The trial court had in rem jurisdiction over the bond money and subject matter jurisdiction over the criminal case in which the bond was posted. Thus, the ex parte order of the trial court is valid until vacated or set aside by the trial court or reversed on direct appeal. Plaintiff Mudge never sought such reversal. This Court has not found a due process violation, but only that such a violation was sufficiently alleged.

majority's treatment of plaintiff Mudge's allegations of procedural due process violations under 42 USC 1983; however, I write separately to acknowledge the existence of confusion in the federal circuit courts of appeal regarding the principal case on which the majority relies to resolve the § 1983 issue.[3]

---

The amount of bond money taken may be considered as an item of damages if a due process violation is found on remand.

Further, the validity of the Court of Appeals direction to return the bond money does not depend on whether the issue was adequately briefed or whether we granted leave regarding the question. These observations are non sequiturs, given that the majority affirms the Court of Appeals order returning the bond monies as "proper." The parties may abandon an issue; they may not confer jurisdiction on a court to grant a remedy. Otherwise stated, the issue whether the Court of Appeals had the authority to grant this relief is an issue the parties' approach cannot dictate. In point of fact, the defendant claimed that the orders could not be collaterally attacked, a correct conclusion, and one we would, in any event, reach. Even if the defendant's action is ultra vires of the PRCA, the order of the trial court transferring the monies posted for bond is voidable, not void.

[3] I also concur with the majority's decision regarding plaintiff Brown's § 1983 action to the extent that it orders the trial court to determine whether Brown may collaterally attack the order he signed. We did not grant leave on this question and, therefore, should express no opinion regarding whether this is a question of fact or a question of law. On remand, that determination is a threshold issue for resolution by the trial court. *Stefanac v Cranbrook Educational Community (After Remand)*, 435 Mich 155; 458 NW2d 56 (1990); MCR 2.612.

Brown was imprisoned for 131 days, entitling the county to $3,930 in reimbursement under the Prisoner Reimbursement to the County Act, MCL 801.81 *et seq.*; MSA 28.1770(1) *et seq.* The record in this case reflects that plaintiff Brown settled his case for $3,765 as of June 29, 1989. Plaintiffs' attorney attempted to file an order for return of Brown's bond monies on June 28, 1989. However, the court clerk informed counsel (and noted on the order) that Brown needed to sign his approval and consent to the order because it disbursed Brown's $10,000 bond, in part, to his attorney. The order, which states that $4,000 was to go to the attorney and $6,000 was to go to Brown, also bears a handwritten notation that the disbursements were to be made "after payment to Macomb County sheriff of $3,765." Both versions of the order, the one signed by Brown and the one not signed by him appear in the file with that notation regarding $3,765. The order appears to be valid on its face and sufficient to refute any contention by plaintiff Brown that he was denied due process where he consented to settlement of his attorney fee and debt under the PRCA. Although

I

I concur with the majority's treatment of the counterclaim issue, to the extent that it acknowledges the availability of the county's right to assert its counterclaim for recoupment of its cost of custodial care.[4] However, the majority's discussion of recoupment might be misleading to the trial court. The majority quotes 20 Am Jur 2d, Counterclaim, Recoupment, etc., § 5, p 231, for the proposition that "recoupment refers to a defendant's right, in the same action, 'to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she sues or because the plaintiff has violated some legal duty in the making or performance of that contract.' " *Ante* at 106. While such analysis would correctly apply to a cause of action asserted on a contract in which the defendant raised recoupment as a defense, this is not a cause of action in which recoupment is being asserted on the basis of a contract. However, the majority states, "[D]efendants still have to show that plaintiffs did not comply with some cross obligation or legal duty under the PRCA in order to seek recoupment," *id.* at 108, thus substituting "the PRCA" for the "contract" in the case-law review in Am Jur.

---

the Court of Appeals did not directly address the issue of Brown's consent, the trial court did in its January 24, 1991, opinion and order, and defendants have briefed it and preserved it at all levels. However, given that our grant order was limited to the three issues stated, I agree that a determination limited to whether Brown may collaterally attack the order is appropriate.

[4] Of course, if Brown settled his claim, the county need not assert a counterclaim. The relevant order appears to indicate Brown consented to satisfaction of his obligation under the PRCA for $3,765.

To avoid confusion over assertion of recoupment in the contract setting as opposed to other contexts,[5] the trial court ought to analyze the defendant's right to assert the defense in light of the Supreme Court's discussion of recoupment in *Bull v United States*, 295 US 247, 262; 55 S Ct 695; 79 L Ed 1421 (1935):

> [R]ecoupment is in the nature of *a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded.* Such a defense is never barred by the statute of limitations so long as the main action itself is timely. [Emphasis added.]

The rule is clear: If a counterclaim or defense arises out of the same transaction, occurrence, or claim as the plaintiff's claim, it is in the nature of recoupment, and the statute of limitations is inapplicable as long as the plaintiff's claim is timely and the defendant's right to recoupment existed when the plaintiff's claim arose. Recoupment beyond the statute of limitations will serve only to diminish or negate the defendant's liability in damages to the plaintiff. Because this case is not one in which the defendant asserts recoupment on a contract, the majority's reference to the rule regarding a legal duty or cross obligation under a contract is misplaced.

Should the trial court resolve the issue with respect to the county's conduct in such a way as to conclude that the § 1983 claim exists wholly outside the *Zinermon* dispute because the county sanctioned the alleged due process rationale by official act or cus-

---

[5] Recoupment is not necessarily limited to contract law. See 20 Am Jur 2d, Counterclaim, Recoupment, etc., § 33, p 257. Its common applicability to tax law is but one example of its use outside the context of contract law.

tom, the conclusion that the county's hands are unclean might be appropriate. *Zinermon v Burch*, 494 US 113; 110 S Ct 975; 108 L Ed 2d 100 (1990). However, if the county merely hired an individual to implement the PRCA and that individual and the sheriff acted without the county's sanction, the county should not be found to have unclean hands where it attempted in good faith to comply with the PRCA. As noted above, if the county did not officially sanction the ex parte bond-retention procedure, under *Monell*, the county is likely not even the proper defendant. *Monell v New York City Dep't of Social Services*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978). Resolution of the issue now would amount to the Court's resolving that the county's official sanction was present, a conclusion not supported by this record.

As the record now stands, the county hired an individual to implement a prison reimbursement program in May of 1985 on the recommendation of the sheriff and the county "Prisoner Reimbursement Subcommittee." However, nothing in the record indicates that the county board of commissioners endorsed any specific policy regarding how implementation of the PRCA was to occur officially or otherwise.

Instead, the record appears to indicate that the county attempted, through the sheriff's department and the individual hired to implement a reimbursement program, to utilize a procedure that would impose the legal obligations of the act, while providing inmates an opportunity to avoid the time-consuming and costly burdens of civil litigation. In its answers to interrogatories, dated April 3, 1991, the county supplied a document entitled "Macomb County Jail Reimbursement Program Update Sum-

mary Report—08/19/85." The document appears to be
the result of the efforts of the individual hired to
implement the PRCA. It notes that the procedures
described therein are "intended to give a general
overview of typical implementation of the program."
The document generally describes implementation:

> Under this Act, an inmate who willfully refuses to coop-
> erate in the counties [sic] attempts to seek reimbursement
> may be denied a ¼ reduction of his or her sentence (under
> [MCL 801.257; MSA 28.1747(7)]). Inmates [sic] cooperation
> in this matter is highly stressed, and is enforced by the
> Sheriff's discretion in revoking "good time" for refusal to
> cooperate. Refusing to make payments on the other hand,
> may result in civil action filed against him or her for up to
> six months after the sentence was served. The county could
> also seek a restraining order preventing the inmate from
> disposing [of] property pending a hearing.

As I read the procedures outlined in the report, the
county employee, under the PRCA, designed a program
whereby the county: (1) informed the prisoners of
their obligation to pay reimbursement and that the
county would bill the prisoners accordingly pursuant
to subsection 3(1) ("The county may seek reimburse-
ment for any expenses incurred by the county . . .
[including $30] per day for the expenses of maintain-
ing that prisoner or the actual per diem cost . . .
whichever is less . . . , [the cost to] investigate the
financial status of the person[, and] [a]ny other
expenses incurred by the county in order to collect
payments under this act"); (2) developed a financial
history form (subsection 3[2], by which it sought to
determine the prisoners' ability to pay); (3) informed
the prisoners of their duty to cooperate in the collec-
tion process (subsection 5[1]) or be subject to penal-

ties under the act (subsection 5[2]—denial of good time credit); § 7—civil action seeking reimbursement expenses; and (4) referred cases to the county's corporation counsel where inmates refused or made no attempt to pay. Nowhere in the document does a procedure for attaching bond monies appear; however, the document's reference to the temporary restraining order references such orders as "pending a hearing."

The summary update reflects the county's apparent good-faith attempt to comply with the PRCA by instituting a collection process enforced by denial of good time and the civil action as set out in the act. However, the record does not reflect how the retention of bond monies by ex parte order without a mechanism for a hearing became part of the process.[6]

That the bond monies were retained "in lieu of" a statutory debt does not conclusively establish that the county intentionally sought to deny the prisoners their rights under the constitution or the PRCA, or otherwise committed inequitable conduct sufficient to invoke the doctrine of unclean hands. It is equally likely that the order was occasioned by a misinterpretation of the requirements of the act, or that the orders were inartfully drafted without expressly providing for a hearing. This does not change the fact that the plaintiffs here have sufficiently alleged a denial of due process. However, regardless of whether this failure was attributable to the county's evil intent, or whether the plaintiffs' delay in seeking

---

[6] Further support for the fact that the county was attempting to proceed in good faith under the statute is found in the fact that the ex parte orders were obtained in the venue mandated by the statute. MCL 801.88(1); MSA 28.1770(8)(1). ("If the defendant is still a prisoner in the county jail . . . venue is proper in the county in which the jail . . . is located.")

the return of bond was timed to foreclose assertion of the debt, the record is wholly inadequate.

Should the trial court determine that the clean hands defense is available with respect to the counterclaim, common sense dictates that the trial court should also consider the nature of the plaintiffs' conduct. The plaintiffs knew they had posted bond, but there is no indication that plaintiff Mudge ever sought return of her bond money by an appropriate motion. Nor is there any indication why she did not. Likewise, there is no explanation of how she discovered the bond would not be returned. Plaintiff Mudge did not move for return of bond, or seek to set aside the order in the district court, or seek an appeal when she became aware of the order. Instead, as the record now stands, it is equally possible that, with knowledge of the order, plaintiff Mudge waited until the six-month period had passed before filing a § 1983 claim. Plaintiff Brown signed an order that appears to have settled his case. Plaintiff Mudge apparently sat on her rights, and there is no indication in the record that she ever cooperated in the county's reimbursement collection process. Thus, the trial court might appropriately determine that the equities are in balance.

II

As noted by Judge Easterbrook, the confusion created by *Zinermon v Burch, supra,* and its relationship to *Parratt v Taylor,* 451 US 527; 101 S Ct 1908; 68 L Ed 2d 420 (1981), and *Hudson v Palmer,* 468 US 517; 104 S Ct 3194; 82 L Ed 2d 393 (1984), has resulted in "a line of precedent . . . resembling the path of a drunken sailor . . . ." *Easter House v Felder,* 910 F2d 1387, 1409 (CA 7, 1990) (second reh en

banc) (Easterbrook, J., concurring) (*Easter House III*).[7] *Easter House III* was the second en banc opinion of the United States Court of Appeals for the Seventh Circuit discussing this difficult issue, and it is a leading case in identifying the dispute over *Zinermon* in the federal circuit courts. I concur with the majority here because its decision is consistent with Judge Cudahy's dissents in *Easter House III* and *Easter House v Felder*, 879 F2d 1458, 1481 (CA 7, 1989) (reargued en banc) (*Easter House II*), and Judge Cudahy's original panel opinion in *Easter House v Felder*, 852 F2d 901, 904 (CA 7, 1988) (*Easter House I*).

A

A plaintiff seeking to maintain a due process claim under § 1983 must allege a deprivation of "a constitutionally protected interest in 'life, liberty, or property.' " *Williams v Langston*, unpublished opinion of the United States Court of Appeals for the Seventh Circuit, issued March 4, 1997 (Docket No. 95-3314), 108 F3d 1380; 1997 WL 113726, *1 (CA 7, 1997).[8] With respect to plaintiff Mudge, I agree with the majority that "[p]laintiffs' allegations are sufficient to state a cause of action for violation of their due process rights . . . because [defendants] seized plaintiffs' bond monies without . . . a hearing of any kind . . .

---

[7] Similarly, Judge Edith Jones observed, "*Zinermon* undoubtedly complicated an already overloaded procedural due process jurisprudence." *Caine v Hardy*, 905 F2d 858, 863 (CA 5, 1990) (Jones, J., dissenting).

[8] "An actionable section 1983 claim must allege facts sufficient to support a determination '(i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States.' " *Rumford Pharmacy v East Providence*, 970 F2d 996, 998 (CA 1, 1992).

[and] treated the bond monies as if . . . forfeited to the county and as if [the ex parte orders attaching the bond monies had been] already reduced to a judgment, without . . . notice and a hearing." *Ante* at 102.[9] The sheriff allegedly treated the ex parte orders as if they established the county's right to receive the monies rather than as a temporary restraint on disposition of plaintiffs' property pending further hearing. Thus, the due process violation alleged arises not from the use of an ex parte procedure, but from its misuse in contravention of the statutory procedures to effectuate a property deprivation without a hearing.[10]

The difficulty confronting the courts in cases involving these types of claims is determining whether a given claim should be evaluated under the *Parratt/Hudson* doctrine, which teaches that where a government official engages in random and unauthorized activity that results in a deprivation of life, liberty, or property, due process is satisfied by adequate

---

[9] It should be clear that the only recognizable allegation of a due process violation here is the failure to provide for notice and a show cause hearing in the ex parte orders before proceeding to attach and distribute the bond money into the general fund. In all other respects, I read the record as indicating the county proceeded properly in developing a collection process under the PRCA. Future ex parte orders restraining disposition of assets should only restrain disposition pending notice and a hearing to show cause why the assets should not be applied to reimbursement under the act, at which the court may order proper disposition. MCL 801.88(2); MSA 28.1770(8)(2). A civil action under the act is not the county's exclusive remedy, but is an enforcement procedure to ensure payment and compliance with the county's collection process under the act.

[10] Treatment of the plaintiffs' claims as alleged violations of substantive due process would be inappropriate where defendants' conduct cannot be characterized as " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " *Sierra Lake Reserve v Rocklin*, 938 F2d 951, 957-958 (CA 9, 1991), quoting *Village of Euclid, Ohio v Ambler Realty Co*, 272 US 365, 395; 47 S Ct 114; 71 L Ed 303 (1926).

postdeprivation process. *Zinermon* appears to require predeprivation process in virtually all circumstances, see *id.* at 127-128 (the *Parratt/Hudson* doctrine applies only in rare cases), but courts have struggled to apply its analysis consistently.

The issue turns on *Zinermon*'s reference to the third prong of its apparent test that in order to trigger *Parratt/Hudson*, the defendants' conduct must be " 'unauthorized' in the sense the term is used in *Parratt* and *Hudson*." *Zinermon* at 138. The courts' difficulty lies in determining when the conduct of the official actor is sufficiently authorized that the plaintiff may avoid the *Parratt/Hudson* doctrine.[11]

If *Parratt/Hudson* is interpreted narrowly, a plaintiff may successfully state a § 1983 cause of action where an official actor's allegedly unconstitutional conduct is wholly outside the discretion delegated to

---

[11] This issue is directly related to the issue whether the plaintiffs have a § 1983 cause of action against the county and to how the case will proceed on remand. As correctly noted by the Court of Appeals, an issue "yet to be determined regarding plaintiffs' § 1983 claim [is] the existence of an official municipal policy or custom." 210 Mich App 436, 448; 534 NW2d 539 (1995). While we recognize that plaintiff has sufficiently alleged a § 1983 cause of action, discovery should allow the trial court to determine whether and to what extent the procedure for obtaining ex parte orders, drafted in such a way as to deprive plaintiffs of notice and a hearing, was officially authorized by the county's deliberate or customary acts. If the conduct was so authorized, under *Monell, supra,* the officially sanctioned act allegedly depriving plaintiffs of their rights under the Due Process Clause is actionable under § 1983 without reference to *Parratt/Hudson*. However, should discovery reveal that the county did not deliberately or by custom authorize the drafting of the ex parte orders so as to allow the orders to be treated as judgments authorizing transfer of the bond monies into the general fund, the Court's position on the dispute over the meaning of *Parratt/Hudson* after *Zinermon* will determine whether plaintiffs' action may go forward. Because we have adopted the narrow view of *Parratt/Hudson*, as explained below, plaintiffs' cause of action will go forward even if the county did not officially sanction the ex parte bond retention procedure, but the county may not be an actionable defendant given the requirements of *Monell.*

the actor in the context of applicable procedural safe-
guards, i.e., where the alleged deprivation was in
direct procedural contravention of the state statute
authorizing the very deprivation that occurred. Alter-
natively, if *Parratt/Hudson* is interpreted broadly, and
postdeprivation process is available, the plaintiff may
not maintain the § 1983 cause of action where the
official actor's allegedly unconstitutional conduct was
not authorized by the delegation of discretion.

If a court selects the narrow interpretation of *Par-
ratt* under *Zinermon*, a far greater number of plain-
tiffs will succeed in alleging a § 1983 cause of action
than under the broad interpretation. The latter view
would leave plaintiffs alleging a procedural depriva-
tion in contravention of state laws designed, at least
in part, to protect against the same to state-law reme-
dies.[12] Not having received briefing from the parties
and amici curiae in addressing *Zinermon*, the major-
ity opts for the narrow view with surprisingly little
analysis.[13]

B

The several opinions issued by the Seventh Circuit
in *Easter House* provide the parameters of the run-
ning dispute over the meaning of *Zinermon*.[14] The

---

[12] An underlying and inadequately addressed issue in the case before us
is whether the conduct of the official actor is attributable to the county
defendant. See n 18.

[13] Neither the parties nor the amici curiae in this case briefed or cited
*Zinermon* or its progeny in the federal circuit courts of appeal. Although I
join the majority, my preference would be to seek supplemental briefing.

[14] "At the heart of the dispute in *Easter House* is the question of
whether procedural due process violations require that the challenged
action be taken not only under color of state law, but also, pursuant to
state law." Blum, *Local government liability under section 1983*, 575
PLI/Lit 53, 273 (1997). Notably, Judge Posner, who joined the majority in

majority in *Easter House III* concluded that the state action in question was the kind of random and unauthorized action that fails to state a claim where the state provides an adequate postdeprivation remedy pursuant to *Parratt/Hudson*. The plaintiffs alleged that the defendants conspired to deprive the plaintiff of its adoption agency license. In concluding that the deprivation fell within the *Parratt/Hudson* doctrine, the court reasoned:

> Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a state's conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the employee now has chosen to ignore. Such a limitation upon § 1983 maintains the delicate balance between the state and federal judicial systems, leaving the former to remedy individual torts and the latter to address property deprivations which occur without adequate due process protection. [*Easter House III* at 1404-1405.][15]

Significantly, the majority held:

---

*Easter House II*, changed his vote on remand for reconsideration in light of *Zinermon* and joined Judge Cudahy's dissent in *Easter House III*.

[15] If we were to apply this reasoning, we would find in defendants' favor here, because the circumstances giving rise to this case did not "result from a state's conscious decision to ignore the protections guaranteed by the Constitution." Rather, the deprivations appear to have arisen as a result of the alleged acts of officials "in direct contravention of the state's established policies and procedures . . . designed to guarantee the very protections . . . ignore[d]," i.e., a predeprivation show cause hearing under MCL 801.88(2); MSA 28.1770(8)(2). Of course, the actors responsible could have otherwise provided due process by providing other constitutionally sufficient notice and an opportunity to be heard.

> Where adequate postdeprivation remedies exist in a state
> to redress a property deprivation which has resulted from
> an employee's random and unauthorized deviation from
> established state policy and procedure, a party cannot
> maintain a § 1983 action because he has received all of the
> process which was due. [*Id.* at 1408.]

It is the phrase "random and unauthorized deviation from established state policy and procedure" that makes the Seventh Circuit's holding significant. *Parratt* and *Hudson* did not involve procedural deviations. The acts alleged were negligent and intentional conduct by state officials that resulted in due process deprivations. In *Zinermon*, unlike *Parratt* and *Hudson*, the challenged conduct involved either a deviation from procedural safeguards or an unconstitutionally broad delegation of authority. *Zinermon* at 135-136. Thus, Judge Cudahy, writing for the dissenters in *Easter House III* concluded that the majority missed the point of *Zinermon*. *Id.* at 1410.

Judge Cudahy observed that, under *Logan v Zimmerman Brush Co*, 455 US 422; 102 S Ct 1148; 71 L Ed 2d 265 (1982), "*Parratt* does not extend to cases in which an 'established state procedure' destroys someone's property right without according that person proper predeprivation process." *Easter House III* at 1410 (Cudahy, J., dissenting). In other words, with regard to established state procedures, *Logan* appeared to take the narrow view of the scope of the *Parratt/Hudson* doctrine. Judge Cudahy further noted that the Supreme Court "granted certiorari in *Zinermon* precisely in order to resolve the circuit conflict over *Parratt*'s proper scope," *id.* at 1411, that is, what constitutes "an established state procedure." Our decision today is consistent with Judge Cudahy's

dissenting interpretation of *Zinermon* "that predeprivation process is the rule, not the exception," *Easter House III* at 1411, to the extent the analysis applies to established procedures and to the extent there were such established procedures in this case.[16]

Judge Cudahy's first dissent in *Easter House II* aptly explained the position we adopt:

> Stripped of their analytical intricacies, *Parratt* and *Hudson* teach a fairly straightforward lesson (or so I had thought before today's decision): while the procedural aspect of the due process clause generally requires that the state provide a hearing before it takes away someone's property, it is physically impossible to grant a predeprivation hearing where the taking is a "fluke," unplanned and uncontrollable. Such an accident occurs, for example, where a state employee who has no business meddling with anyone's property rights nevertheless deprives someone of property. (Note that in both *Parratt* and *Hudson* the employee who took the plaintiff's property was acting completely beyond the pale of his or her assigned responsibilities—in *Parratt*, by signing for (and thereby taking custody of) the plaintiff's package, in direct violation of prison rules; in *Hudson*, by destroying innocuous items of personal property during a search for contraband.) In these unpredictable and unpreventable situations (and in emergencies, where a predeprivation hearing is unwise) all that a state can realistically offer is a post-deprivation remedy; all that a federal court presented with a due process claim can do is assure itself that the state remedy is "plain, speedy and efficient." [*Id.* at 1481-1482.]

---

[16] In this case, it is as yet unclear whether there was an established state procedure or whether the actors responsible for the alleged deprivation were acting outside their authority in deviating procedurally from the show cause hearing requirement under the PRCA while failing to provide other constitutionally sufficient process. See, e.g., MCR 3.310.

As in *Zinermon*, the case before us does not appear to involve an unplanned, uncontrollable deviation from the authorized state procedure resulting in deprivation of a constitutionally protected interest by "fluke."[17] Our position is, therefore, consistent with Judge Cudahy's conclusion that

> for purposes of determining whether the "state" has violated an individual's constitutional right to due process, the "state" generally includes any person to whom is delegated the responsibility of giving predeprivation process. . . . ("The State delegated to [the hospital staff] the . . . authority to effect the very deprivation complained of here . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement.") [*Easter House III* at 1411, quoting *Zinermon* at 138.]

Likewise, in our case, the state delegated to the county defendant the authority, through the sheriff, to effect the deprivation of which plaintiffs complain, and the duty to comply with the legislatively promulgated procedural safeguards or otherwise initiate constitutionally sufficient procedures. The alleged abuse of the ex parte mechanism in the PRCA amounts to an alleged failure to abide by the statutory safeguards or otherwise provide notice and a predeprivation hear-

---

[17] In *Zinermon*, a liberty interest was at stake, while here, as in the *Easter House* cases, a property interest is at stake. Judge Easterbrook acknowledged that part of the difficulty here may flow from the case law's distinction between liberty and property, and that the majority's approach there, as well as in *Parratt, Hudson,* and *Zinermon*, might have turned partly on that distinction. See *Easter House III* at 1408-1410 (Easterbrook, J., concurring). While some cases have endorsed this distinction, *Zinermon, supra* at 116, n 2, and 131, n 16, the Supreme Court has not done so. *Id.* at 132 ("We . . . do not find support in precedent for a categorical distinction between a deprivation of liberty and one of property").

ing, see, e.g., MCR 3.310, thus stating a claim under
§ 1983.[18]

The Fifth Circuit's panel decision in *Caine v
Hardy*, 905 F2d 858 (CA 5, 1990) (*Caine I*),[19] is also

---

[18] The county has not argued that the sheriff is a state official, rather
than a county official, in an attempt to defeat attribution of the sheriff's
conduct to the county. See *McMillan v Monroe Co, Alabama*, 520 US 781,
785-786; 117 S Ct 1734; 138 L Ed 2d 1 (1997) (determining whether the
county sheriff's acts are attributable to the municipality on the basis of [1]
"whether governmental officials are final policymakers for the local gov-
ernment in a particular area, or on a particular issue," and [2] "the defini-
tion of the official's functions under relevant state law"); *Bryan Co,
Oklahoma Bd of Co Comm'rs v Brown*, 520 US 397, 404; 117 S Ct 1382;
137 L Ed 2d 626 (1997) ("[I]t is not enough for a § 1983 plaintiff merely to
identify conduct properly attributable to the municipality. The plaintiff
must also demonstrate that, through its *deliberate* conduct, the municipal-
ity was the 'moving force' behind the injury alleged"). Federal cases have
held that where a plaintiff met the requirements for alleging local govern-
ment liability under *Monell, supra* at 690-691, the "complaint asserting
municipal liability . . . by definition [would] state[] a claim to which *Par-
ratt* is inapposite." *Wilson v Civil Town of Clayton, Ind*, 839 F2d 375, 380
(CA 7, 1988). If "the suit is allowed under *Monell* because the action was
executed in accordance with 'official policy,' the tortious loss of property
can never be the result of a random and unauthorized act." *Id.* It is
unclear whether *Zinermon* has changed this analysis. See, e.g., Blum, n 14
*supra* at 264. Proceedings below will presumably resolve the issue
whether the sheriff acted as a state official in accordance with his author-
ity under the PRCA or pursuant to official county procedure. Thus, they will
resolve whether the sheriff's conduct in obtaining the ex parte orders falls
within the *Zinermon* controversy or, as an established state procedure
that denies due process, is governed only by *Monell*.

[19] The Fifth Circuit, in an opinion by Judge Edith Jones, reversed on
rehearing en banc, *Caine v Hardy*, 943 F2d 1406 (CA 5, 1991) (*Caine II*),
ultimately adopting a similar approach to that which was adopted in the
Seventh Circuit in the *Easter House* cases. Although we adopt an
approach rejected by the Seventh and Fifth Circuits, in cases in which the
Supreme Court denied certiorari, my concurrence with the majority's
adoption of the apparent minority approach stems from my agreement
with the authorities explained and the continued unsettled nature of this
area of the law in light of the Supreme Court's failure to provide clearer
guidance. Judge Easterbrook joined the majority in *Easter House III*
because he believed, "despite the force of Judge Cudahy's arguments,
Judge Kanne offers the best estimate of the course a majority of the
[Supreme] Court will take . . . ." *Easter House III* at 1409. Perhaps, in
light of the Supreme Court's denials of certiorari in *Easter House III* and
*Caine II*, we should be inclined to follow the Seventh Circuit majority and

instructive with regard to the debate over the limits of the *Parratt/Hudson* doctrine. The Fifth Circuit panel, having interpreted *Parratt* narrowly, acknowledged that *Zinermon* effectuated a change in the "controlling constitutional authority . . . [and] require[d] reconsideration of [the] Court's *Parratt/Hudson* jurisprudence." *Caine I* at 861. Judge Williams, characterized the *Zinermon* decision as being based on three considerations: (1) the deprivation occurred at a predictable time, (2) predeprivation process was not impossible, and (3) the conduct in question was not " 'unauthorized' as that term was used in *Parratt* and *Hudson.*" *Id.* at 861. The officials in *Zinermon* were delegated by the state the authority to effectuate "the very deprivation complained of," *Caine I* at 861, quoting *Zinermon* at 138, and proceeded to ignore the procedural safeguards designed to ensure constitutionality. The officials in *Parratt* and *Hudson* never had any such authority.[20]

---

find for defendant here. However, I find Judge Cudahy's position more persuasive, as does, I believe, Justice TAYLOR. Moreover, little guidance may be gleaned from the Court's denials of certiorari in *Easter House III* and *Caine II* considering the Court's apparently inconsistent remand and subsequent denial in *Fields v Durham,* 909 F2d 94, 97 (CA 4, 1990) (discussed below).

[20] The *Zinermon* Court stated:

  Burch's suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. . . . [Burch] seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue. [*Id.* at 136.]

Perhaps, on this basis, we might distinguish our case from *Zinermon* and find for the defendants, given that the officials here were not abusing "broadly delegated, uncircumscribed power to effect the deprivation at issue." Indeed, treating the ex parte orders as if they were judgments was in direct contravention of the statutory safeguards, namely, the hearing procedure, circumscribing the authority to effect a deprivation of bond

Judge Williams explained:

The lesson of *Zinermon* is that the *Parratt/Hudson* doc-
trine is restricted to cases where it truly is impossible for
the state to provide predeprivation procedural due process
before a person unpredictably is deprived of his liberty or
property through the unauthorized conduct of a state actor.
In *Zinermon*, however, the deprivation was not unpredict-
able. It was not impossible, therefore, for the state to pro-
vide predeprivation procedural due process. Since the state
actor who caused the deprivation was authorized to take
the action that caused the deprivation, the *Parratt/Hudson*
doctrine did not apply. It follows that when the *Par-
ratt/Hudson* doctrine does not apply, a § 1983 plaintiff can
state a claim for the state's failure to provide predeprivation
procedural due process. [*Caine I* at 862.][21]

---

monies to which plaintiffs were entitled at the conclusion of their
sentences. The approach taken in *Easter House III* would likely result in
the conclusion that such unauthorized conduct does not give rise to a
§ 1983 cause of action. Unlike the situation where the state delegates have
uncircumscribed power, the abuse is not foreseeable within the statutory
framework, assuming the existence of safeguards creates an expectation
that officials will comply with those safeguards.

[21] *Caine I* referenced *Easter House II* and the Supreme Court's remand
for reconsideration in light of *Zinermon*, as well as the Supreme Court's
similar remand in *Fields v Durham*, 856 F2d 655 (CA 4, 1988), in which
the Fourth Circuit applied the *Parratt* doctrine to a state college adminis-
trator's discharge. In *Fields*, the administrator plaintiff alleged the state's
dismissal procedures were misapplied. On remand, the Fourth Circuit,
consistent with our decision here, characterized the *Parratt* doctrine as
applying only to a "narrow class of cases" in which " 'postdeprivation tort
remedies are all the process that is due, simply because they are the only
remedies the State could be expected to provide.' " *Fields v Durham*, n 19
*supra* at 97. In deciding the case in the defendant's favor, the court con-
cluded that "[p]redeprivation process was not only prescribed . . . , it
was actually provided." *Id.* Notably, however, the court observed that
under *Zinermon* "the provision of some predeprivation process remains
the preferred constitutional course," *id.*, and formulated a two-part analy-
sis under *Zinermon*:

*Zinermon* . . . requires that we first ask whether the risk of an
erroneous deprivation was foreseeable, and next "whether
predeprivation safeguards would have any value in guarding
against the kind of deprivation . . . allegedly suffered."

It is worth noting, despite the conclusion that *Caine I*, *Easter House I*, and *Fields* present the correct understanding of *Zinermon*, that Judge Jones dissented in *Caine I* with intensity rivaling that of Judge Cudahy in the *Easter House* cases, and that Judge Jones' approach ultimately won over the Fifth Circuit en banc in *Caine v Hardy*, 943 F2d 1406 (CA 5, 1991) (*Caine II*). Judge Jones' ultimately prevailing view was succinctly described in *Caine I*:

> *Zinermon* analyzed the state officials' conduct in admitting Burch to the mental hospital and concluded that *Parratt/Hudson* did not vindicate the adequacy of a postdeprivation remedy because the voluntary commitment procedure presented both a high risk of erroneous deprivation of a mentally ill person's liberty, and the substantial likelihood that minimal further procedural safeguards could readily have avoided the deprivation. *Zinermon* requires a hard look at a *Parratt/Hudson* claim to determine whether the state official's conduct, under all the circumstances of the deprivation, could have been adequately foreseen and addressed by procedural safeguards. If it could, then the case requires classic *Matthews* [*v Eldridge*, 424 US 319; 96 S Ct 893; 47 L Ed 2d 18 (1976)] balancing and has stated a claim for relief. *Zinermon* did not, however, explicitly or implicitly disavow the *Parratt/Hudson* doctrine, nor did it portend that any alleged violation of procedural due process undertaken within the scope of an established and articulated state regulatory framework automatically falls

---

Clearly, under this analysis, the majority reaches the correct conclusion today. Although the Fifth and Seventh Circuits ultimately took a different approach, I find persuasive the *Caine* panel's reasoning that "in both *Fields* and *Easter House*, the deprivations were predictable, the state could have provided predeprivation procedural due process, and the deprivations occurred at the hands of state actors who were authorized by the state to take the actions that caused the deprivations. Thus, under *Zinermon*, neither *Fields* nor *Easter House* should be controlled by the *Parratt/Hudson* doctrine." *Caine I* at 862. The same reasoning applies with equal force to this case.

outside the purview of *Parratt/Hudson*. *Zinermon* employs and hence requires case-by-case analysis of the deprivation at issue. See *Zinermon*, O'Connor, dissenting [494 US 139]. [*Caine I* at 865 (Jones, J., dissenting).]

However, Judge Jones also acknowledged agreement with the majority that "*Zinermon* . . . restricted *Parratt/Hudson* to cases in which 'it truly is impossible to provide pre-deprivation safeguards.' " *Id.* at 865-866. Her disagreement, like the disagreement in the Seventh Circuit, lies chiefly with the scope to be given *Zinermon* regarding the issue whether misuse or abuse of delegated power can ever be considered random and unauthorized given that the actors were " 'authorized' to effectuate the scheme." *Caine I* at 866 (Jones, J., dissenting). Judge Jones explained why, under her interpretation, "[t]he factors which distinguish *Zinermon* from *Parratt/Hudson*" were not applicable to the plaintiff's loss of privileges in *Caine*:

There is no deficit in the hospital's procedural regulations. As previously stated, the doctor challenges solely the bias of his peers and their violation of those regulations. These allegations naturally disprove the majority's third *Zinermon* based conclusion that the "state actors' actions in the present case were not unauthorized." . . . Of course they were! Investigatory and judicial bias in implementing the regulations is always unauthorized, if they are not alleged to flow from the regulations themselves. *Holloway v Walker*, 784 F2d 1287, 1292-1293 (CA 5, 1986). Nearly every paragraph of Dr. Caine's 50-page complaint concludes with the assertion that the hospital actors' conduct violated a particular provision of the regulations. The majority have already assumed away the only reason authorized by the regulations for immediate suspension of hospital privileges, i.e., to protect the safety of patients. Hence it follows that any other action which brought about that result had to be unauthorized by the regulations. In *Zinermon*, by contrast,

the voluntary admission of the patient may have been an abuse of judgment by the staff authorized to admit him, but their exercise of judgment was specifically condoned by the regulations. "Florida's [statutory scheme] . . . gives state officials broad power and little guidance in admitting mental patients." *Zinermon* [494 US 135]. Such is emphatically not the case under the conditions assumed by the majority. [*Caine I* at 866-867 (Jones, J., dissenting).]

Judge Jones, thus, distinguished between officials whose exercise of judgment is specifically authorized, but applied in an unconstitutional manner largely because the legislature failed to adequately circumscribe the discretion delegated, and officials whose conduct is outside the parameters of the discretion granted them under state law and therefore characterized as random, unauthorized, and unpredictable sufficient to trigger the *Parratt/Hudson* doctrine. This may correctly explain *Zinermon*. Like Judge Easterbrook's reference to the difference between liberty and property, Judge Jones' distinction between a delegation of "broad power and little guidance" and a delegation of discretion that is more limited by procedural safeguards within a statute may provide a clue about the Supreme Court's underlying rationale in *Zinermon*. If so, *Zinermon* may, as Judge Jones suggests, represent a sui generis situation. However, lacking the comfort of further Supreme Court clarification, I agree with the majority and the approach taken by Judge Williams for the *Caine I* majority and by Judge Cudahy, that "predeprivation process is the rule, not the exception," *Easter House III* at 1411 (Cudahy, J., dissenting), and that § "1983 applies to all violations of constitutional rights—not only those that are authorized by state law, but also those that result

from abuses of state authority and are forbidden by state law." *Id.* at 1412.[22]

Although the majority appears to imply that the rule to be gleaned from *Zinermon* is clear, there is confusion in the federal circuit courts over the meaning and effect of that case on § 1983 jurisprudence. As the above sampling of the leading cases indicates, the only conclusion that can confidently be stated is that the relationship between *Parratt/Hudson* and *Zinermon* requires further clarification.[23]

---

[22] Judge Jones' approach would logically lead to the conclusion, contrary to *Monell, Monroe v Pape,* 365 US 167; 81 S Ct 473; 5 L Ed 2d 492 (1961), and *Zinermon* that abuses of state authority are not within § 1983, but that the statute only applies to violations authorized by state law, i.e., the cause could only lie where the legislature expressly authorized the unconstitutional deprivation or *implicitly authorized it by failing to adequately circumscribe the actors' discretion/authority.* This approach, however, contradicts the *Zinermon* Court's statement that, "where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Id.* at 132. Moreover, the Court, in rejecting application of *Parratt/Hudson,* reasoned:

It is immaterial whether the due process violation Burch alleges is best described as arising from petitioners' failure to comply with state procedures . . . or from the absence of a specific requirement that petitioners determine whether a patient is competent . . . . [*Id.* at 135-136.]

See also *Seals v Edwards,* unpublished opinion per curiam of the United States Court of Appeals for the Sixth Circuit, issued January 13, 1993 (Docket No. 91-2215), 985 F2d 561; 1993 WL 5932, *2 (CA 6, 1993) (reasoning that it is illogical to equate the concept of wrongdoing with random and unauthorized conduct in the presence of an established state procedure, thereby requiring "every plaintiff . . . to plead himself out of court").

[23] The conclusion of the majority is fortified by the Supreme Court's recent reference to *Zinermon* in *Gilbert v Homar,* 520 US 924, 930; 117 S Ct 1807; 138 L Ed 2d 120 (1997):

This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide

C

One way to approach analysis of the controversy involves two models of § 1983 jurisprudence. See Juarez, *The Supreme Court as the Cheshire cat: Escaping the section 1983 wonderland,* 25 St Mary's L J 1, 19 (1993). The "Legalist Model" would, consistent with a strict interpretation of *Parratt* and *Hudson,* ask only "whether state laws are constitutionally adequate. If there is an adequate state law, then the plaintiff cannot bring a Section 1983 claim, and must instead rely on state-law claims heard, in most cases, in state court." Juarez, *supra* at 8. Presumably, this approach would encompass both express and implied inadequacies. The "Governmental Model" would allow a § 1983 cause of action where "any state official has infringed the plaintiff's constitutionally protected

---

predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.

On the other hand, Justice Kennedy has stated more specifically:

[T]he price of our ambivalence over the outer limits of *Parratt* has been its dilution and, in some respects, its transformation into a mere pleading exercise. The *Parratt* rule has been avoided by attaching a substantive rather than procedural label to due process claims (a distinction that if accepted in this context could render *Parratt* a dead letter) and by treating claims based on the Due Process Clause as claims based on some other constitutional provision. . . . It has been avoided at the other end of the spectrum by construing complaints alleging a substantive injury as attacks on the adequacy of state procedures. See *Zinermon* . . . ; *Easter House* . . . . These evasions are unjustified given the clarity of the *Parratt* rule: In the ordinary case where an injury has been caused not by a state law, policy, or procedure, but by a random and unauthorized act that can be remedied by state law, there is no basis for intervention under § 1983, at least in a suit based on "the Due Process Clause of the Fourteenth Amendment *simpliciter.*" [*Albright v Oliver,* 510 US 266, 285; 114 S Ct 807; 127 L Ed 2d 114 (1994) (Kennedy, J., concurring).]

interests . . . even when the state's lawmakers have
sought to prevent the violation of constitutional
rights." *Id.* at 10.[24] Although it had appeared that the
Legalist Model was the governing model after *Hud-
son*, *Zinermon* added confusion to the equation,
demonstrated by the decisions of the federal courts in
response. As Juarez noted, "The [*Zinermon*] Court
concluded by freely mixing the Governmental and

---

[24] See also Alexander, *Constitutional torts, the Supreme Court, and the
law of noncontradiction: An essay on* Zinermon v Burch, 87 NW U L R
576, 576-577 (1993):

[T]he Legalist model . . . speaks to and imposes duties upon
government officials when they act as lawmakers. The ques-
tion . . . is whether the state's laws . . . and allocations of law
enforcement resources are constitutionally adequate . . . to pro-
tect individuals' constitutionally protected interests. If they are not
adequate, . . . the lawmakers are considered to have contributed
to the infringement and have themselves violated the plaintiff's
constitutional rights.

If the laws *are* constitutionally adequate, however, . . . under
the Legalist model, the Constitution has not been violated even if
government officials injure individuals.

\*     \*     \*

Under [the Governmental] model, the [Due Process Clause]
speaks not only to government officials qua lawmakers, but also to
the much broader class of all government officials and agents. The
question . . . is whether officials of any sort have infringed the
plaintiff's constitutionally protected interests, regardless of whether
the lawmakers had forbidden and attempted to prevent the
infringement. . . . The federal cause of action is available, even in
the presence of constitutionally adequate state laws and . . . reme-
dies . . . because the government officials have violated the consti-
tutional command despite the lawmaking officials' efforts to pre-
vent that violation.

As observed above, the difference between a legalist approach and a
governmental approach may be irrelevant as to the county's liability if the
plaintiffs can establish that the sheriff acted on behalf of and pursuant to
an officially sanctioned procedure of the county. It is when the actor's
conduct is contrary to the established procedure or where the extent of
discretion delegated is unclear that the confusion in the case law becomes
relevant.

Legalist Models, although these two models are contradictory in their approaches." Juarez, *supra* at 24.[25] Although the *Zinermon* Court clearly reached the result that would be reached under the Governmental Model, *Zinermon*'s use of both the Legalist Model and the Governmental Model has led to divergence among the circuits. The majority in our case also reaches the result that the Governmental Model would yield.

The Juarez article reviews the scope of the dispute in the circuits as it existed in 1993. "Contrary to *Zinermon*'s description of *Parratt* as the 'unusual' case, the courts of appeals in both published and unpublished decisions clearly favored the Legalist Model . . . us[ing] the Legalist Model in thirty-four appellate decisions, while applying the Governmental Model in only eight." Juarez, *supra* at 31. Similarly, as of 1993, the district courts favored the Legalist Model 23 to 18. Under *Easter House*, the Seventh Circuit is clearly a Legalist circuit. See *Easter House III, supra* at 1404-1405. The majority apparently puts us in the

---

[25] The Governmental Model grows out of a line of cases beginning with *Home Telephone & Telegraph Co v City of Los Angeles*, 227 US 278; 33 S Ct 312; 57 L Ed 510 (1913), and culminating with *Monroe v Pape*, n 22 *supra*. Alexander, n 24 *supra* at 580-581. The Legalist Model can be traced back to *Barney v City of New York*, 193 US 430; 24 S Ct 502; 48 L Ed 737 (1904). Alexander, n 24 *supra* at 580-581. *Parratt* and *Hudson* marked the resurrection of the Legalist Model, but *Zinermon* seems to affirm and reject it at the same time. See Alexander, n 24 *supra* at 586-587, quoting *Zinermon* at 124 (Governmental) and 135 (Legalist). In short, the *Zinermon* Court's analysis is contradictory because it recognizes first that § 1983 is supplemental to state remedies, thus making the existence of an enforceable state law irrelevant, while simultaneously reasoning that liability was available to Burch under § 1983 because Florida lawmakers may have delegated impermissibly broad discretion on its officials. Alexander, n 24 *supra* at 586-587. Thus, Alexander observes that "exactly where [the Court] is . . . locating the constitutional defect surely is unclear. *Id.* at 587.

minority and at odds with the Seventh Circuit with respect to the interpretation of § 1983 post-*Zinermon* by reaching the Governmental Model result.[26] The leading cases in the Fifth Circuit apply a Legalist approach, see *Caine II, supra*; *Charbonnet v Lee*, 951 F2d 638 (CA 5, 1991), while the Fourth Circuit appears to adhere more closely to the Governmental approach. See Juarez, *supra* at 30-31; *Fields v Durham*, 909 F2d 94 (CA 4, 1990).[27] Confusion has also developed within the circuits over how to approach § 1983 after *Zinermon* to the extent that cases combine both models or different panels or courts in the same circuit apply different approaches. See, e.g., Juarez, *supra* at 34  (detailing splits within various circuits).

---

[26] The decisions of the Sixth Circuit, at the time of the Juarez study, appeared to favor the Legalist Model slightly.

[27] Juarez observes that two factors have driven the lower federal courts toward the Legalist Model despite *Zinermon*: the flood of § 1983 litigation and federalism, Juarez, *supra* at 51, but later characterizes these rationales as having "little support in the reality facing the federal courts . . . ." *Id.* at 66. Notably, Juarez also advocates a return to "pre-*Parratt* standards" as the solution to the confusion generated by *Zinermon*, thus reinstituting "the basic principle announced in prior cases: predeprivation process is not required when it is impractical to provide it." Juarez, *supra* at 62-63. Such an approach would apparently yield the same result as the Court reached in *Zinermon*, as well as the result the majority reaches here. The three tests set out in *Zinermon*, and loosely applied by the majority here—(1) whether the deprivation was predictable, (2) whether predeprivation process was not impossible, and (3) whether the defendants' conduct was unauthorized, see Juarez, *supra* at 24—would not disappear altogether under this approach. Predictability and impossibility, because they are closely related from a logical standpoint to practicality, would survive under a return to the pre-*Parratt* standards, while the inquiry into whether the conduct was authorized, which, as demonstrated above, is the primary source of the confusion among the courts after *Zinermon* and *Parratt*, would be eliminated. Juarez, *supra* at 63-65. This approach appears to be consistent with the case law predating *Parratt*, as well as the governmental approach, and would apparently settle the confusion by discarding the third test but continuing to allow dismissals where predeprivation process was impractical.

Although commentators[28] and a majority of the federal courts appear to have questioned the validity of the Supreme Court's approach in *Zinermon,* the majority simply stands on *Zinermon* and leaves it at that. I have written separately to explore some aspects of the problem to give a signal to the bench and bar regarding the significance of this case and, it is hoped, encourage the Supreme Court to revisit this issue.[29]

The fundamental problem with *Zinermon* is that it reaches the more "governmental" result while employing, in part, the more "legalist" inquiry into the

---

[28] In addition to Juarez, *supra,* see, e.g., Fallon, *Some confusions about due process, judicial review, and constitutional remedies,* 93 Columbia L R 309, 347-348, n 219 (1993), quoting Hart & Wechsler, The Federal Courts and the Federal System, p 145 (3d ed, supp 1992) ("*Zinermon* enormously confuses the analysis of random and unauthorized deprivations, . . . makes sense only if read to hold that Florida's procedural scheme . . . was constitutionally defective, . . . [and] 'will doubtless be difficult to interpret and apply' . . . . All that seems certain is that the Supreme Court will have to provide clarification. . . . It is therefore unclear . . . whether *Zinermon* . . . effect[s] a major cutback, or indeed any cutback at all, on the *Parratt* doctrine."); Oren, *Signing into heaven: Zinermon v Burch, federal rights, and state remedies thirty years after Monroe v Pape,* 40 Emory L J 1, 8, 67 (1991) ("*Zinermon* establishes that *Parratt* is a narrow rule"); Capra, *Discretion must be controlled, judicial authority circumscribed,* . . . , 50 Md L R 632, 727-728 (1991) (fair application of *Zinermon* conflicts with federalism principles underlying *Parratt* but states can avoid *Zinermon* relatively easily by writing a statute that circumscribes authority).

[29] Ideally, upon such consideration, the Court would adopt more clearly one of the two approaches. The Court could adopt a more "legalist" approach, that addresses only the constitutional adequacy of state laws, policies, and procedures, i.e., whether the state has expressly or impliedly authorized the unconstitutional deprivation, thus leaving plaintiffs to state-law remedies where there is no unconstitutional official act. Alternatively, the Court could adopt a more "governmental" approach that focuses on whether a policymaker has deprived an individual of a constitutionally protected interest, even in the presence of a constitutionally valid act seeking to prevent such a deprivation, thus providing plaintiffs with a federal remedy in the vast majority of cases where predeprivation process was not impractical under the circumstances.

authorization issue. For the purposes of our case, the
more appropriate result is the one the Governmental
Model would reach, although elements of the "legal-
ist" approach appear to survive in Justice TAYLOR's
opinion as they did in *Zinermon.* To be certain, lower
courts will be better served to err on the side of the
"governmental" approach, as we have done, rather
than seeking to glean a coherent rule from
*Zinermon.*[30]

Observing a clear disagreement in the federal cir-
cuit courts of appeal over the implications of
*Zinermon,* this Court has decided to place itself on
one side of the dispute, apparently the minority side.
It is hoped that in time, clearer guidance will emerge.
Pending such clarification, I concur with the major-

---

[30] It may be useful to note, as well, that the relief available in these
cases was also addressed in *Zinermon,* where the Court referenced the
fact that

> a deprivation of procedural due process is actionable under § 1983
> without regard to whether the same deprivation would have taken
> place even in the presence of proper procedural safeguards. . . .
> [H]owever, . . . in cases where the deprivation would have
> occurred anyway, and the lack of due process did not itself cause
> any injury (such as emotional distress), the plaintiff may recover
> only nominal damages. [*Id.* at 125-126, n 11.]

Section 1983 should stand as a deterrent to the misuse of the judicial
process to obtain monies owed under the PRCA. Assuming there is an equi-
table element to the availability of the recoupment defense, a county's fail-
ure to provide due process in seeking reimbursement, in light of the fact
that counties have notice of our decision here, would likely be sufficient
to preclude assertion of an equitable defense. Moreover, continued failure
to provide due process in seeking reimbursement from uncooperative
individuals may provide grounds for an award of punitive damages under
federal law.

I also note that the statute of limitations applicable to § 1983 claims in
Michigan is three years under MCL 600.5805(8); MSA 27A.5805(8). See,
e.g., *Krum v Sheppard,* 255 F Supp 994, 997 (WD Mich, 1966), aff'd 407
F2d 490, 491 (CA 6, 1967).

ity's result that plaintiff Mudge has stated a claim under 42 USC 1983.[31]

WEAVER, J. I concur only in part I.

---

[31] Whether Brown also has a cause of action under § 1983 will turn on the determination whether he may collaterally attack the order he signed.