**In re R & D CONTRACTING, L.L.C., Debtor.**

**R & D Contracting, L.L.C., Plaintiff,**

**v.**

**Jenkins Construction, Inc., Defendant.**

**Bankruptcy No. 02–43540.**

**Adversary Pro. No. 02–5127.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

April 7, 2008.

Harvey K. Babcock, Farmington Hills, MI, for Plaintiff.

James W. McGinnis, Detroit, MI, for Defendant.

## AMENDED TRIAL OPINION

THOMAS J. TUCKER, Bankruptcy Judge.

In this adversary proceeding, Plaintiff R & D Contracting, L.L.C. ("R & D") seeks to recover from Defendant Jenkins Construction, Inc. ("Jenkins") a total of $157,408.87 for work, materials, and the rental of certain equipment by R & D relating to two construction projects. R & D is the debtor in the related chapter 11 bankruptcy case (No. 02–43540). It brings this adversary proceeding under authority granted to it by the confirmed plan of liquidation in the Chapter 11 case.[1] The Court conducted a five and one-half day bench trial. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated in this Opinion, the Court finds for R & D in part, and

---

1. Order Confirming Plan (Docket # 302); Combined Plan and Disclosure Statement (Docket # 187).

against R & D in part, on its claims, and will enter judgment for R & D in the total amount of $92,264.37 plus interest.

## I. Jurisdiction and venue

The Court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), and the United States District Court's Local Rule 83.50(a) (E.D.M.). The parties correctly agree that, at a minimum, this proceeding is "related to" the R & D Chapter 11 bankruptcy case within the meaning of 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). It is unnecessary to determine whether this is a core proceeding under 28 U.S.C. §§ 157(b) and 157(c). To the extent this is not a core proceeding, the parties have consented to the bankruptcy judge entering final judgment under 28 U.S.C. § 157(c)(2).[2]

Venue is proper under 28 U.S.C. § 1409(a), and is not disputed.

## II. Discussion

R & D's claims relate to two construction projects, which this opinion will refer to as the "MDOT" project and the "Greater Grace" project.[3]

### A. R & D's claims relating to the MDOT project

The MDOT project involved the construction of two buildings for the Michigan Department of Transportation ("MDOT") on Interstate 94 in Port Huron Township, Michigan. Defendant Jenkins was the general contractor hired by MDOT for the project, which included construction of a salt storage building and another building to house an office and a garage/maintenance facility, as well as installation of on/off ramps, a parking lot, and related landscaping.[4] Jenkins hired a number of subcontractors to work on the project, including R & D.

The subcontract between Jenkins and R & D was a written contract entitled "Subcontract Agreement" dated September 19, 2000.[5] The Subcontract stated that R & D was to "perform certain labor and furnish certain material for the erection and completion of Sitework [i]n accordance with specifications prepared by: D.L.Z. [of South Bend, Indiana, the "Architect"]." The Subcontract further described the "Sitework" to be done as:

1. Complete all earthwork, grading and balancing in strict accordance to Drawings and Specifications.

2. Work is to include all cut and fill necessary to meet subgrade elevations noted and required at all areas.

3. Complete all erosion control as required.

4. Provide all equipment and labor necessary to complete work.

5. Clean up and remove all debris caused by your work.[6]

The Subcontract incorporated certain "Contract Documents" and further defined the scope of R & D's work by reference to

---

**2.** *See* Stipulation and Order Consenting to Reference to Bankruptcy Court (Docket # 56).

**3.** R & D's operative complaint is its "First Amended Complaint" filed at Docket # 11, a copy of which, minus its Exhibit B, was admitted into evidence at trial as Defendant's Exhibit 16.

**4.** Testimony of Bryan Ritter; testimony of Larry Ancypa; Plaintiff's Exhibit 13. This opinion will cite testimony of trial witnesses by simply giving their name, after the initial citation which gives the witness's full name. For example, a citation to the testimony of Bryan Ritter henceforth will be stated as "Ritter." Trial exhibits will be cited in abbreviated form as "PX(5)6D" and "DX(5)6D" for Plaintiff's exhibits and Defendant's exhibits respectively.

**5.** PX–2.

**6.** PX–2 at pp. 1, 2.

specific drawings and specifications, including:

M.D.O.T. Drawings Sheets 1–5 dated May 5, 2000

D.L.Z. Drawings dated June 13, 2000

Specifications dated for Bid August 4, 2000 [7]

Jenkins agreed to pay R & D the sum of $85,000.00 for its work under the Subcontract.[8]

The parties stipulated that during the course of the MDOT project, "Jenkins requested R & D perform additional work which included providing and installing all stone required for a temporary road on the project, including grading. A change order was issued for this work in the amount of $26,541.42." [9] The change order brought the total Subcontract price to $111,541.42. The parties stipulated that of this amount, Jenkins paid R & D a total of $98,839.85,[10] leaving an unpaid amount of $12,701.57.[11]

R & D makes four different claims for sums owing by Jenkins relating to the MDOT project. These are (1) the unpaid $12,701.57 contract balance just described; (2) $29,760.00 to compensate R & D for certain "equipment stand down time" that R & D suffered during the project; (3) $17,463.50 for extra work R & D claims it did, outside the scope of the Subcontract, on an agreed time-and-material basis, for moving topsoil, and doing certain grading and installation of certain "swales" on the job site; and (4) $40,500.00 for removal by R & D of excess topsoil.

This opinion will discuss each of these claims separately.

### 1. R & D's claim for the $12,701.57 unpaid balance under the Subcontract

As noted above, and as the parties stipulated, Jenkins issued a written change order amending the Subcontract, for R & D to perform additional work, including providing and installing stone required for a temporary road and related grading. The change order increased the total Subcontract price from $85,000.00 to $111,541.42.

This change order was dated June 18, 2001,[12] and was the only written change order Jenkins issued for R & D under the Subcontract. The change order states that the work added was "as required and directed by Bryan Ritter." Ritter was the project superintendent for R & D on the MDOT project until December 2000, when he left the project.[13] The extra work added by this change order was actually done by R & D several months before the change order was issued.

Because the parties also stipulated that Jenkins paid R & D a total of $98,839.85 for the MDOT project, it is undisputed that there is an unpaid balance of $12,701.57 under the Subcontract. The only defense that Jenkins asserts to this claim is that R & D did not properly complete all of its work under the Subcontract. Jenkins presented some evidence of this through the testimony of Michael Skomial, who was Jenkins's project superintendent on the MDOT project from December 2000 forward.

Skomial testified that R & D removed too much topsoil from the area of one of the buildings to be constructed, then filled

---

7. PX–2 at p. 2, Article II.

8. *Id.* at Article III–B.

9. Joint Final Pretrial Order (part of Docket # 120) at p. 6, Stipulation of Fact # 11.

10. *Id.* at Stipulation of Fact # 12.

11. *See also* DX–8.

12. PX–11.

13. Ritter; testimony of Michael Skomial.

this "undercut area" with material that R & D failed to properly compact. After the fill material got wet from rain and snow, it had to be removed and replaced with suitable fill material. According to Skomial, Jenkins had to hire one of its other subcontractors, Raymond Excavating, to remove the unsuitable fill material and place compacted stone in its place.[14] According to Skomial, Jenkins issued a change order to Raymond Excavating to perform this work.

Skomial was vague in estimating the extra cost incurred by Jenkins in hiring Raymond Excavating to do this work. Skomial speculated that this extra cost "could have been" as much as $18,000-$20,000. Jenkins did not present any change order or other documentation to back up Skomial's testimony that Jenkins hired Raymond Excavating to do this work. Nor did Jenkins produce any documentation to demonstrate the actual amount it incurred to Raymond Excavating for this work. And Skomial, who left Jenkins's employment in 2004, did not know whether Jenkins ever actually paid Raymond Excavating anything for this work. Nor did Jenkins present any evidence that it paid Raymond Excavating for this work, or prove how much it paid. And Jenkins presented no evidence that it ever issued any back-charge against R & D's Subcontract due to the cost of this work, even though the Subcontract would have authorized that.[15]

Skomial also testified, even more vaguely, that R & D did not complete all of its work under the Subcontract because there were some areas where R & D should have cut drainage swales,[16] but did not do so. Again, Skomial testified that Jenkins hired Raymond Excavating to do this work, and gave Raymond Excavating a change order for it. Skomial testified that the extra cost of hiring Raymond Excavating to do this work was $7,500.00, but he did not know if Jenkins ever paid Raymond Excavating for the work. Jenkins presented no change order to Raymond Excavating, no documentation indicating that any change order was issued to Raymond Excavating for this work, and no evidence that Jenkins ever paid Raymond Excavating anything for this work.

By contrast, R & D presented evidence, which the Court credits, that R & D fully performed its work as required by the Subcontract.[17]

The Court concludes that Jenkins has failed to meet its burden of proving its defense. Under Michigan law, which the parties agree applies, the defense is in the nature of recoupment—that Jenkins incurred and paid additional costs to Raymond Excavating because of a failure by R & D to complete its required work under the Subcontract. *See Mudge v. Macomb County*, 458 Mich. 87, 106, 580 N.W.2d 845, 855 (1998)("[t]he defense of recoupment refers to a defendant's right, in the same action, 'to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which he or she

---

14. Skomial described this problem in a letter he sent to R & D's Robert DeGeorge dated February 19, 2001. DeGeorge was one of the owners of R & D, and is now deceased. An unsigned copy of Skomial's letter was admitted into evidence as DX–21.

15. PX–2 at p. 3, Article VI.

16. A swale, according to the testimony of R & D's Robert Pasek, is a depression or indentation in the ground smaller than a ditch, through which water can flow to a catch basin. It is used for drainage. A swale can be as small as a 4–6 inch indentation, or smaller.

17. Testimony of Robert Pasek (a co-owner of R & D).

sues or because the plaintiff has violated some legal duty in the making or performance of that contract' ") (citations omitted). Jenkins had the burden of proving this affirmative defense. *See Truax v. Heartt*, 135 Mich. 150, 154, 97 N.W. 394, 396 (1903). Jenkins did not meet that burden. Moreover, the Court finds that R & D did fully perform its work as required by the Subcontract.

· For these reasons, the Court finds for R & D and against Jenkins on this claim for $12,701.57, and will enter judgment accordingly.

### 2. R & D's $29,760.00 claim for equipment stand-down time

■ R & D claims that Jenkins owes it $29,760.00 for so-called equipment stand-down time during the period October 23, 2000 through November 1, 2000. R & D billed Jenkins for this amount, in an invoice dated November 1, 2000,[18] and the parties agree that Jenkins never paid this invoice.

The issue over equipment stand-down time arose after R & D brought its own heavy equipment onto the job site and was working on the project. During the time period covered by R & D's invoice, R & D was unable to do its excavating and related work because of delays caused by another of Jenkins's subcontractors, Dan's Excavating. As R & D's project superintendent at the time, Bryan Ritter, testified, the question arose whether R & D should move its equipment offsite during the stand-down time, so that R & D could use the equipment on other jobs, or whether R & D should leave its equipment on the MDOT project job site, sitting idle, during the stand-down time.

Ritter discussed the issue with R & D's Robert DeGeorge. At the time, the parties did not know how long the stand-down time would be, but Ritter wanted the R & D equipment left on site so that as soon as the stand-down delay ended, R & D could get back to work immediately. Ritter was concerned that if R & D moved its equipment off site to another job, it might not be able to bring the equipment back immediately after the stand-down time ended.[19] As Ritter and DeGeorge discussed, R & D wanted compensation for leaving its equipment idle on the MDOT job site rather than taking the equipment to another job and earning money with it there. As R & D's Robert Pasek testified, R & D did have other job opportunities at the time. This included an opportunity to rent the equipment to a contractor in Canton Township who was building a new subdivision and needed more equipment.[20]

R & D's Ritter discussed this issue with his superior, Steve Muhn. Muhn was the project manager for Jenkins on the MDOT project. Both Ritter and James Jenkins, the President and co-owner of Jenkins, testified that as project manager, Steve Muhn had full authority to approve and agree to any additional work and additional costs on behalf of Jenkins, and to authorize and approve change orders on behalf of Jenkins. Ritter kept Muhn fully informed, and Muhn's direction to Ritter was to consider all of the information and make a decision.[21] In this way, Muhn expressly delegated his authority to Bryan Ritter to decide what to do about the equipment stand-down issue.

With full authority delegated to him by Muhn, Ritter made an oral agreement on behalf of Jenkins with R & D (through Robert DeGeorge) for R & D to leave its

---

18. PX–4.

19. Ritter.

20. Pasek.

21. Ritter.

equipment on the MDOT project job site for the duration of the stand-down time. In exchange for R & D doing this, Ritter agreed, on behalf of Jenkins, to pay R & D for eight hours per day for each item of equipment listed on the R & D invoice (PX–4) at the hourly rates listed on that invoice, for each day of the standdown.[22] As confirmed by the invoice, the stand-down time covered the days of October 23–27, 2000, October 30 and 31, 2000 and November 1, 2000.[23] The total charge, as reflected on the invoice, is $29,760.00. The parties, through Ritter and DeGeorge, agreed that R & D would invoice Jenkins for this charge and Jenkins would pay it. The parties understood that Jenkins would submit the invoice to MDOT and seek payment from MDOT for this extra cost. But Jenkins orally agreed to pay R & D for this charge regardless of whether Jenkins ultimately obtained reimbursement from MDOT.[24]

Jenkins contends that Bryan Ritter had no authority to bind Jenkins to the oral agreement he made with R & D. The Court has found otherwise, however, in finding that the project manager for Jenkins, Steve Muhn, who did have such authority to bind Jenkins, authorized Bryan Ritter to make such an oral agreement with R & D on behalf of Jenkins.

Jenkins also contends that R & D's claim is barred by several of the written Subcontract provisions, because (1) Jenkins never issued a written change order for this additional charge; (2) R & D did not invoice Jenkins for this charge using the proper "A.I.A." forms; (3) R & D did not give written notice of this extra charge within fourteen days after it was incurred; and (4) Jenkins was never paid by MDOT for this charges. The Subcontract provisions relevant to Jenkins's arguments are described below.

First, Jenkins argues that R & D's claim had to be made in writing to Jenkins within fourteen days, under Article VII of the Subcontract. Jenkins claims that R & D did not give written notice of its claim, and did not do so within fourteen days. As a result, Jenkins argues, the claim is expressly waived under Article VII of the Subcontract. Article VII states, in part:

ARTICLE VII–CLAIMS FOR ADDITIONAL COMPENSATION OR EXTENSION OF TIME

*If the Subcontractor shall have any claims for additional Work, extension of time, damage for delays or otherwise he shall make all such claims promptly to the Contractor* in accordance with the Contract Documents. *Claims must be made within 14 days or such lesser time stipulated in the Contract Documents* after occurrence of the event giving rise to the claim or within 14 days or such lesser time stipulated in the Contract Documents *after Subcontractor first recognizes the condition giving rise to the claim, which ever is later. Claims must be made by written notice. . . . Subcontractor waives any claim which is not made as provided in this Article.*[25]

Second, Jenkins contends that the Subcontract bars R & D's claim because it was not authorized by a written change order amending the Subcontract, signed by Jenkins. The Subcontract states the following:

9. No monies are to be invoiced without a signed Jenkins Construction, Inc. Subcontract Purchase Order or Change Order. . . .

---

22. Ritter.

23. PX–4; Ritter.

24. PX–4; Ritter.

25. PX–2 at p. 3, Article VII (emphasis added).

10. Change Orders must be approved by the Project Coordinator before they can be added to subcontractor invoices. The contract amount cannot be altered without authorization and payment will not be made for unauthorized work.[26]

Third, Jenkins argues that the Subcontract required that any request for payment by R & D be made on specific standard "A.I.A." forms,[27] submitted to Jenkins no later than the 20th of the month following R & D's provision of materials and/or services. R & D's claim is barred, according to Jenkins, because R & D did not follow these requirements. Jenkins claims that the only request for payment in writing from R & D was an R & D invoice issued months after the equipment stand-down charges were incurred. Article IV–B of the Subcontract states, in part, that:

Application and Certificate for Payment must be a standard A.I.A. Document— G702 and G703 Forms, and must be in the General Contractor's office on or before the 20th of the month for materials and/or services furnished during that month.[28]

Fourth, Jenkins argues that the R & D claim is barred because the Subcontract provides that Jenkins (the "General Contractor") had no duty to pay R & D (the "Subcontractor") for any claim or charge until seven days after Jenkins received payment from MDOT (the "Owner"). Because Jenkins was never paid by MDOT for the R & D charge at issue, Jenkins contends, no duty to pay R & D ever arose under the Subcontract. Article IV–B of the Subcontract states:

The General Contractor shall pay the Subcontractor the approved net monthly estimate payment due the Subcontractor within seven (7) days after Contractor's receipt of monthly estimate payment from the Owner. Final payment shall be made to Subcontractor within seven (7) days from General Contractor's receipt of final from Owner.[29]

Under Michigan law, a non-modification provision in a written contract, stating that the contract may be modified only by a writing signed by the parties, can itself be modified by subsequent *oral* agreement of the parties. Such a non-modification clause also can be waived, either expressly or impliedly. In that respect, such a contractual non-modification clause is on the same footing with every other provision in a written contract. The party claiming such an oral modification or waiver bears the burden of proving it.

The United States Court of Appeals for the Sixth Circuit, applying Michigan law, recognized these principles in *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir.1989):

It is indeed, as Cloverdale claims, well-established that subsequent oral modifications of a written contract may be valid notwithstanding a contract provision indicating that only written modifications are effective *(see Morley Brothers, Inc. v. F.R. Patterson Construction Co.*, 266 Mich. 52, 253 N.W. 213 (1934)) Michigan assigns the burden of proof of subsequent oral modification to the alleging party, *Rasch v. National Steel Corp.*, 22 Mich.App. 257, 177 N.W.2d 428, 429 (1970), and in light of a written-modification-only provision, vague asser-

26. *Id.* at p. 8 ¶¶ 9, 10.

27. "A.I.A." means the American Institute of Architects. *See* DX–4, p. 1.

28. *Id.* at p. 2, Article IV–B; *see also id.* at p. 8, ¶ 3.

29. *Id.* at p. 2, Article IV–B; *see also id.* at p. 8, ¶ 11.

tions of an oral modification fail to raise a genuine factual issue sufficient to defeat a summary judgment motion. *Bushwick–Decatur Motors v. Ford Motor Co.,* 116 F.2d 675, 678 (2d Cir.1940).

Many Michigan cases dealing specifically with construction contracts apply these principles. In *Morley Bros., Inc. v. F.R. Patterson Construction Co.,* 266 Mich. 52, 253 N.W. 213, 214 (1934), for example, the Michigan Supreme Court held that a written contract may be amended by subsequent oral agreement, despite a provision in the original contract precluding amendment except by written agreement. The court found in that case that an enforceable, separate agreement was made when a general contractor ordered additional hardware from a subcontractor. *In Klas v. Pearce Hardware & Furniture Co.,* 202 Mich. 334, 168 N.W. 425, 426, 427 (1918), the court held that a construction contract provision requiring that any extra work be ordered by the owner's architect in writing may be waived, either expressly by the parties, or impliedly by statements or by "a course of acts and conduct which amounts to an estoppel," or "by so neglecting and failing to act as to induce a belief that there is an intention or purpose to waive." *The Hayman Co. v. Brady Mechanical, Inc.,* 139 Mich.App. 185, 362 N.W.2d 243, 244, 246–47 (1985) involved a construction contract that required all changes to be authorized by a written change order signed by the owner or architect. The court held that where the owners were aware of and authorized extra work, they could be deemed to have waived the written change order requirement, "because they knew about and verbally ordered the changes." The court also held that where such extra-work changes were authorized orally, but without an agreement as to price, the owners could be held liable on a *quantum meruit* theory. *See also Cascade Electric Co. v. Rice,* 70 Mich.App. 420, 245 N.W.2d 774, 775, 776 (1976)(construction contract provision prohibiting any alterations in the work except by written change order "may be waived by the person benefitted by such provision"); *Jarosz v. Caesar Realty, Inc.,* 53 Mich.App. 402, 220 N.W.2d 191, 193 (1974)(commercial construction contract required written change orders; court held that (1) this did not bar *quantum meruit* relief where contracting owners "were aware of and authorized changes and were benefitted by" the extra services; and (2) contracting owners also held to have waived written change order requirement "because they knew about and verbally ordered the changes"); *G.O. Lewis Co. v. Erving,* 4 Mich.App. 589, 145 N.W.2d 368, 370, 371 (1966)(court found enforceable implied promise by contracting owner to pay for extra work under construction contract despite clause requiring that any extra work be authorized in writing before being done; owner waived such provision because its architect had submitted changes in the plans and specifications, and owner had knowledge of the work as it progressed).

The Court finds that Jenkins waived the written Subcontract provisions at issue, and orally modified its written Subcontract with R & D to add this additional charge for the equipment stand-down time, by making the oral agreement described above. The oral agreement is enforceable.

For these reasons, the Court finds for R & D and against Jenkins on this claim for $29,760.00, and will enter judgment accordingly.

### 3. R & D's $17,463.50 claim for additional work done during March through May 2001

R & D claims that Jenkins owes $17,463.50 for extra work that R & D did on eleven different days during the period March 23, 2001 through May 11, 2001. R & D billed Jenkins for this amount in an

invoice dated May 11, 2001, and the parties agree that Jenkins never paid the invoice.[30]

As shown by the testimony of R & D's Robert Pasek and Jenkins's Mike Skomial, and on the invoice, the work at issue involved moving and spreading topsoil in certain areas of the job site; performing certain grading work, and cutting swales. R & D's Pasek testified that none of this work was covered by the Subcontract. Rather, it was all extra work for which R & D should be paid extra. Pasek further testified that R & D's project superintendent Mike Skomial agreed that this work was extra work, requested R & D to do this work, and said that Jenkins would pay for the work on a time-and-material basis. R & D presented no documentation or other evidence to support these assertions.

Jenkins's Mike Skomial disputed Pasek's testimony. He testified that this work was part of the scope of the work covered by the written Subcontract, not additional work. He testified that this work was part of the "Sitework" described at item 1 on page 2 of the Subcontract, namely, "[c]omplete all earthwork, grading and balancing in strict accordance with the Drawings and Specifications."[31] Skomial further testified that the swales at issue were part of the original drawings.[32] Skomial further testified that R & D never requested a change order for this work and that R & D's invoice for this work (PX–5) was never submitted to him.

The Court concludes that R & D did not meet its burden of proving, by a preponderance of the evidence, that (1) any of the work covered by this claim and reflected in its May 11, 2001 invoice (PX–5) was *extra* work, *i.e.*, work not already required of R & D by the written Subcontract; or that (2) Jenkins (through Mike Skomial or anyone else) ever agreed that any of this work was extra work not covered by the Subcontract; or (3) that Jenkins agreed to pay R & D extra for this work. As a result, R & D's claim based on this work must fail, and the Court will enter judgment for Jenkins in this respect.

### 4. R & D's $40,500.00 claim for removal of excess topsoil

R & D claims that Jenkins owes an additional $40,500.00 because the amount of topsoil that R & D had to excavate and remove as part of its work under the Subcontract was approximately 18,000 cubic yards more than the amount indicated by the Subcontract. R & D claims that soil boring data on the project drawings, which are part of the Subcontract and which R & D relied on in making its bid for the project, indicated about 18,000 cubic yards *less* of topsoil than R & D actually encountered.

R & D admits that it never invoiced Jenkins for this extra work, claiming that its failure to invoice this $40,500.00 item was an oversight.[33] Nor was this claim pled by R & D in either its original Complaint (Docket # 1) or its First Amended Complaint (Docket # 11). The First Amended Complaint states four counts, each presenting a different legal theory in support of its claim against Jenkins for the unpaid invoices itemized on Exhibit A to the Complaint. As R & D admitted during trial, that itemization does not include this $40,500.00 claim for removal of excess topsoil.[34] Further, R & D's attorney swore, in the "Affidavit of Account Stated" attached as Exhibit B to R & D's First Amended Complaint, that the statement of account owing from Jenkins to R & D

---

30. PX–5.

31. Skomial; PX–2 at p. 2, Article II(B).

32. Skomial; PX–13 at p. C2.1.

33. Pasek.

34. Pasek; DX–16.

attached as Exhibit A to the complaint (which does not include this $40,500.00 item) was accurate and correct.[35]

R & D's claim that it had to excavate extra topsoil was discussed in at least eight different meetings between Jenkins and Hubbell, Roth & Clark ("HRC"), the project consultant for MDOT. These meetings occurred during the time period October 3, 2000 through April 11, 2001.[36] During the early meetings and while he was involved as project superintendent on the MDOT project, Bryan Ritter of Jenkins supported R & D's contention that it had to excavate significantly more topsoil than the amount indicated by the drawings. Ritter further supported this claim in his testimony at trial.

Neither party presented any evidence at trial indicating that anyone measured the depth of the topsoil that R & D was excavating before R & D had already removed it. R & D placed the topsoil in a designated berm on the job site. Jenkins's Ritter and HRC's Larry Ancypa each testified at trial about measurements that were taken of the amount of soil in the berm.

Ritter testified that unnamed certified engineers measured the berm and found that it contained 28,000 cubic yards of soil. Ritter testified that this calculation is reflected in engineering drawings and written calculations presented to HRC in meetings. But no such documents were presented as evidence at trial. Nor did any such certified engineers testify at trial about this. Nor were any such certified engineers even identified during trial. Ritter testified that based on the drawings, he anticipated that there would only be about 12,000 cubic yards of soil in this berm from R & D's excavations, not 28,000 cubic yards. But Ritter acknowledged that another Jenkins subcontractor, Dan's Excavating, was also permitted to dispose of soil in this same berm, and Ritter did not know how many cubic yards Dan's Excavating put in the berm.

HRC's Larry Ancypa, by contrast, testified that his firm measured the amount of soil in the berm and found it to be approximately 20,000–21,000 cubic yards. Ancypa testified that Dan's Excavating put approximately 9,000 cubic yards of soil into the berm, leaving about 12,000 cubic yards of soil that was put into the berm by R & D. This indicated that R & D had not been required to excavate more topsoil than indicated by the Subcontract drawings.

In part because of this, HRC took the position during the meetings with Jenkins, including a meeting on March 29, 2001 attended by R & D's Robert DeGeorge,[37] that Jenkins and R & D had not adequately proven R & D's claim of excess topsoil.[38] HRC, through Larry Ancypa, repeatedly asked Jenkins and R & D for further and revised calculations to support the claim of extra topsoil, including requests made in meetings on November 1, 2000, February 27, 2001, March 29, 2001, and April 11, 2001.[39] Neither Jenkins nor R & D ever submitted such calculations.[40] Nor were any presented at trial.

The Court concludes that R & D has failed to meet its burden of proving, by a preponderance of the evidence, its claim that it removed excess topsoil, above and beyond the amount that was expected based on the soil boring and other data in

**35.** *See* First Amended Complaint (Docket # 11), Exhibit B, at ¶¶ 3, 4.

**36.** PX–22 through PX–26; DX–12; DX–15; and DX–20.

**37.** DX–15.

**38.** Ancypa.

**39.** Ancypa; PX–26 at pp. 1–2, § 1.10; DX–12 at p. 3; DX–15 at p. 5; DX–20 at p. 1.

**40.** Ancypa.

the project drawings and specifications. For this reason, R & D's claim for this $40,500.00 in additional compensation fails, and the Court will enter judgment accordingly.

### 5. Summary regarding the MDOT project

With respect to R & D's claims relating to the MDOT project, therefore, the Court will enter judgment in favor of R & D in a total amount of $42,461.57, reflecting the claims on which R & D has prevailed.

### B. R & D's claims relating to the Greater Grace project

The Greater Grace project involved the construction of the Greater Grace Temple Church in Detroit, Michigan. Jenkins served as the "Construction Manager" for this project, rather than as a general contractor. Nonetheless, Jenkins made contracts in its own name with various subcontractors working on the project, including R & D.[41] The contract between Jenkins and R & D was entitled "Subcontract Agreement" and was dated March 17, 2000.[42] It described the work to be performed by R & D as "the erection and completion of: Drain Tile in accordance with specifications prepared by: Fusco [S]haffer & Pappas, Inc .... the Architect." The Subcontract further described this work as:

*Drain Tile:*
1. Provide and install 4″ and 6″ drain tile including all connections as shown and specified (also see Bulletin # 1, dated December 21, 1999).

2. Provide and install crushed concrete 8″ below and above drain tile.

3. Complete all excavating for your work.

4. Complete all loading and hauling surface material.

5. Clean up all debris from your work.[43]

The Subcontract incorporated certain "Contract Documents" and further defined the scope of R & D's work by reference to eight listed sets of specifications and drawings.[44] For this work, Jenkins agreed to pay R & D the sum of $43,500.00.[45]

The parties stipulated that during the course of the Greater Grace project, "Jenkins requested R & D perform certain additional work on the project. The work was reduced to change orders amounting to $13,652.00." As a result, "[t]he total contract price for the work performed by R & D for the Greater Grace Project was $57,152.00."[46] The parties also stipulated that Jenkins paid R & D this total amount—$57,152.00—for the Greater Grace project.[47]

In addition to the Subcontract price, R & D claims that Jenkins owes a total of $56,983.80 for extra items of labor, materials, and equipment relating to the Greater Grace project. R & D claims that these extra items were not part of the work covered by the Subcontract, but rather were covered by separate, oral agreements between R & D and Jenkins. These claimed extra items are itemized in twelve separate invoices,[48] which the Court will discuss in several groups.

41. Jenkins; PX–3.

42. PX–3 at p. 1.

43. PX–3 at pp. 1, 2.

44. *Id.* at pp. 1, 2.

45. *Id.* at p. 2.

46. Joint Final Pretrial Order (Docket # 120) at p. 6, Stipulation of Fact Nos. 4, 5. The three change orders were admitted into evidence as DX–3, DX–17, and DX–19.

47. Stipulation of Fact No. 6.

48. PX–10A through PX–10L.

With the exception of two of these invoices, which Jenkins contends were part of the written change orders and paid by Jenkins as part of the $57,152.00 Subcontract price, Jenkins argues that R & D's claims regarding these alleged "extra" items are barred by several provisions of the Subcontract. These contract provisions are identical to the ones argued by Jenkins with respect to the MDOT project. In this respect, the Greater Grace Subcontract between R & D and Jenkins had the same contract terms as those in the MDOT project Subcontract, described in Part II–A–2 of this opinion.[49] Based on the Court's findings stated below, however, these Subcontract terms do not bar R & D's claims.

### 1. R & D invoice nos. 1074 and 1075 (PX–10G and PX–10H)

 These two invoices, each dated February 22, 2000, are for work done and equipment rented by R & D to Jenkins on February 7, 8, and 10, 2000. The invoice amounts are $3,993.50 (invoice no. 1074, PX–10G) and $3,187.50 (invoice no. 1075, PX–10H). Although R & D's Robert Pasek testified at trial that these two invoices were not paid by Jenkins, the Court finds otherwise. Based on the testimony of Daryl Greer, Jenkins's project manager on the Greater Grace project, the Court finds that R & D's charges for these items were incorporated into two written change orders issued by Jenkins, and were paid as part of Jenkins's total payment to R & D of $57,152.00. These are Jenkins change order nos. 9824–09a (revised) dated June 1, 2000 in the amount of $3,993.00 (DX–17) and change order no. 9824–07a, dated April 14, 2000 in the amount of $3,188.00 (DX–3). Thus, R & D's claims as to these two invoices fail.

### 2. R & D invoice nos. 1903 and 1974 (PX–10A and PX–10B)

 R & D claims that it made an oral agreement to rent to Jenkins a 245 Excavator backhoe for the months of October and November, 2000, at the rate of $16,500.00 per month. These rental charges are reflected in R & D invoice nos. 1903 and 1974 (PX–10A and 10B), dated November 1, 2000 and November 30, 2000, respectively.

Carl Donato, who was Jenkins's project superintendent for the Greater Grace project until he left in the Fall of 2000, testified at trial by deposition. He testified that Jenkins made an oral agreement with R & D to rent this 245 Excavator, so that a subsidiary of Jenkins, named Jenkins Excavating, could install a deep sewer line on the project. This line was supposed to have been installed by another Jenkins subcontractor, M & S Construction, but M & S failed to perform. Donato testified that the rental of this equipment from R & D was not part of the written Subcontract, but rather a separate agreement. Donato testified that he made the agreement on behalf of Jenkins, that it was approved by both Daryl Greer, the project manager for Jenkins, and by James Jenkins, the President of Jenkins. Jenkins also told Donato that he had agreed on a price with R & D. Donato further testified that although Jenkins Excavating was going to use this equipment, James Jenkins authorized the rental agreement for both Defendant Jenkins Construction and its subsidiary, Jenkins Excavating. Donato further testified that he was privy to a conversation in which James Jenkins made this agreement with R & D's Robert DeGeorge, with Daryl Greer present.[50]

---

**49.** PX–3 at p. 3, Article VII; p. 7 ¶¶ 9, 10; p. 2, Article IV–B.

**50.** Carl Donato Dep. at 29–39, 45–49.

R & D's Robert Pasek testified to this oral rental agreement as well, and said that he was present when Carl Donato of Jenkins agreed to a rental rate of $16,500.00 per month.

On the other hand, James Jenkins and Daryl Greer of Jenkins each denied agreeing to pay for the use of R & D's equipment. James Jenkins testified that he made an oral agreement with Robert DeGeorge of R & D to use R & D's equipment for no charge, as a "tradeoff" for R & D having left the equipment on the job site in a disassembled condition for months.

The Court finds that Jenkins did make the oral equipment rental agreement as described in the testimony of Carl Donato and Robert Pasek, and as further evidenced and reflected in the two invoices at issue. The Court further finds that this equipment rental agreement was not part of the scope of the work to be done by R & D under the Subcontract, but rather was a separate agreement from the Subcontract. As a result, none of the Subcontract-based defenses asserted by Jenkins apply to or bar these claims by R & D.

For these reasons, the Court finds in favor of R & D and against Jenkins on R & D's claims relating to these two invoices, in the total amount of $33,000.00, and will enter judgment on these claims accordingly.

### 3. The remaining eight R & D invoices

R & D's remaining claims are described on eight R & D invoices admitted into evidence.

### (a) R & D invoice nos. 1251, 1289, and 1341 (PX–10L, 10C, 10D)

■ These three invoices, dated April 25, April 28, and May 17, 2000, are time and material-based invoices for the labor of R & D personnel and the use of R & D Loader and Excavator equipment to remove dirt from the Greater Grace project job site on April 12, 13, 14, and May 12, 2000. The Court finds, based on the testimony of the Jenkins project superintendent, Carl Donato, that (1) this hauling of dirt away from the job site by R & D was not part of R & D's required work under the written Subcontract, but rather additional work not covered by that contract; (2) Carl Donato requested that R & D do this work; (3) Carl Donato had authority, on behalf of Jenkins, to request that R & D do this work and thereby to bind Jenkins to pay for this work; (4) by requesting this work, Donato bound Jenkins to pay for the work; (5) Jenkins did agree to pay the amounts listed on these invoices for this work; (6) Donato discussed these invoices with Daryl Greer, the Jenkins project manager, who had authority to agree to a price for the work on behalf of Jenkins, and Greer approved these invoices; and (7) Jenkins never paid these invoices.[51]

For these reasons, the Court finds for R & D with respect to its claims under these invoices, which total $10,800.00.

### (b) R & D invoice no. 1149 (PX–10E)

■ This invoice, dated March 28, 2000, is for Jenkins's rental from R & D of a 544 John Deere Loader for five hours, for a total amount of $425.00.

### (c) R & D invoice nos. 1138 and 1288 (PX–10I and PX–10F)

These two invoices, dated March 27, 2000, and April 28, 2000, are for R & D's labor, equipment, and material for installing and compacting stone for a "mud mat"

---

**51.** Donato Dep. at pp. 9–10, 52, 55, 56–60, 62–63, 72, 103, 106; Pasek.

in the sanctuary area of the Greater Grace project, to support the steel erectors' crane and keep it out of the mud.[52] These invoices total $3,417.80.

#### (d) R & D invoice no. 1157 (PX–10J)

This invoice, dated February 22, 2000, is R & D's charge for removing and disposing of an underground fuel tank that was discovered on the job site, in the amount of $160.00.[53]

#### (e) R & D invoice no. 99–1363 (PX–10K)

This invoice, dated December 6, 1999, three months before the date of the written Subcontract between R & D and Jenkins (March 17, 2000), is for R & D's pre-contract work in installing drain tile under the stage area of the sanctuary on the Greater Grace project. This was needed for drainage. This invoice is for $2,000.00.[54]

The Court finds, based upon the testimony of Carl Donato and Robert Pasek, that: (1) none of the work, materials, and equipment charges covered by these invoices was part of R & D's required work under the written Subcontract, but rather additional work not covered by that contract; (2) Carl Donato requested all of these things from R & D; (3) Carl Donato had authority, on behalf of Jenkins, to request all of these things from R & D and thereby to bind Jenkins to pay for them; (4) by requesting these items and inducing R & D to provide them, Donato bound Jenkins to pay for these items; (5) Jenkins did agree to pay the amounts listed on these invoices for these items; (6) Donato discussed these invoices with Daryl Greer,

the Jenkins project manager, and Greer approved these invoices; and (7) Jenkins never paid these invoices.[55]

The Court therefore finds for R & D with respect to the claims covered by these eight invoices, which total $16, 802, 80.

Jenkins argues that R & D waived all of its claims for extras relating to the Greater Grace project. R & D's Robert DeGeorge signed a document entitled "Full Unconditional Waiver" on May 8, 2001.[56] Jenkins argues that this document says that R & D has been fully paid for all of its work relating to the Greater Grace project, and that R & D waived any further claims. The actual document, however, does not say or mean these things. It states the following:

FULL UNCONDITIONAL WAIVER

I/we have a contract with Jenkins Construction, Inc. to provide Drain Tile/Site Work for the improvement to the property described as Greater Grace Temple having been fully paid and satisfied, all my/our construction lien rights against such property are hereby waived and released.

STATEMENT OF ACCOUNT

| | | |
|---|---|---|
| Previous payments | $ 41,112.90 | |
| This payment | $ 16,039.10 | CK# 548 |
| Total paid to date | $ 57,152.10 | |
| Balance due | $ | |

The Court concludes that the "contract" referred to in this document, which the document describes as "having been fully paid and satisfied," was only the written Subcontract between R & D and Jenkins, which totaled $56,152.00 after the written change orders. This waiver document does not refer to any of the oral agreements for additional work, materials, or equipment, which were separate agree-

---

52. Donato Dep. at pp. 26–29.

53. Donato Dep. at pp. 21–22.

54. Donato Dep. at pp. 22–23.

55. Donato Dep. at pp. 9–10, 52, 55, 56–60, 62–63, 72, 103, 106; Pasek.

56. DX–5.

ments not encompassed within the written Subcontract. Robert DeGeorge's signature on this waiver document, therefore, does not acknowledge that any of those oral agreements had been fully paid and satisfied. Similarly, the statement in the waiver document that "all my/our construction lien rights against such property are hereby waived and released" is no more than the waiver of any lien R & D might have claimed against the Greater Grace project property. It is not a waiver or release of R & D's claims against Jenkins under the oral agreements between the parties.

### 4. Summary regarding the Greater Grace project

For these reasons, the Court finds for R & D with respect to its claims relating to the Greater Grace project to the extent of $49,802.80 and finds against R & D with respect to the balance it claims. The Court will enter judgment accordingly.

### C. Prejudgment interest, attorney fees, and costs

R & D requests prejudgment interest, attorney fees, and costs. The request for attorney fees must be denied. R & D has presented no valid basis, and no authority, that would permit the Court to award it attorney fees.

■■ R & D bases its claim to prejudgment interest on Michigan law. It requests prejudgment interest "at a legal rate from the date on which money should have been paid by Jenkins," i.e., "the date

the affixed amount is due."[57] R & D has not specified what that "legal rate" is that it is requesting. Further, the Court finds that while R & D did meet its burden of proving that Jenkins owes it money, as to the claims on which R & D has prevailed, R & D did not prove exactly when any of these amounts became due or should have been paid by Jenkins. The evidence presented permits the Court to find only that at least by the time R & D filed its complaint in this adversary proceeding, Jenkins owed R & D the sums on which the Court is entering judgment.

Given this, the Court will award prejudgment interest to R & D only from the date of R & D's complaint, under Mich. Comp. Laws Ann. § 600.6013(8).[58] The amount of prejudgment interest will be calculated using interest rates established under Michigan law, which are adjusted at 6–month intervals, § 600.6013(8). Prejudgment interest will run from the filing date of R & D's complaint to the date on which the judgment is entered, and prejudgment interest will be compounded annually.

R & D also will be entitled to postjudgment interest, to run from the date on which judgment is entered, calculated under 28 U.S.C. § 1961.

Finally, the Court will award costs to R & D under Fed.R.Bankr.P. 7054(b).

### III. Conclusion

For the reasons stated in this opinion, the Court will enter judgment, by separate

---

57. See Plaintiff's Trial Brief (Docket # 125) at p. 6.

58. That statute provides, with exceptions not applicable here, that:

for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6–month intervals from the date of filing the complaint at a rate of interest equal to 1%

plus the average interest rate paid at auctions of 5–year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs.

document, in favor of Plaintiff R & D Contracting, L.L.C. and against Defendant Jenkins Construction, Inc., in the total amount of $92,264.37 plus interest. Judgment for this relief will be entered on Count I of R & D's First Amended Complaint (breach of oral contract). The Court will dismiss the other counts in R & D's complaint, as moot to the extent of the monetary claims on which R & D has prevailed, and with prejudice to the extent of the monetary claims on which Jenkins has prevailed.